## UNITED STATE DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---

**JOSEPH GALE**, an individual,

on behalf of himself and others
similarly situated,

      Plaintiff,

v.                                                                Case No.:
                                                                   Hon.:

**CITY OF ROYAL OAK POLICE
CHIEF CORRIGAN O'DONOHUE**,
in his individual and official capacity,
**PHILLIP KLINGE**, **MIKE PARMO**,
and **NATHAN HEPPNER**, in their
individual capacities, jointly and
severally,

      Defendants.

---

Joseph B. Gale (P79049)
Plaintiff
Michigan Litigation Law
2020 Hazel St.
Birmingham, MI 48009
P: 248-850-5824
F: 248-856-0573
joey@michiganlitigationlaw.com

---

There is no other pending or resolved civil action arising out of the same
transaction or occurrence alleged in this Complaint.

---

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff, Joseph Gale, states the following for his Complaint against the above-named Defendants:

## **INTRODUCTION**

1.   In June of 2016 the United States Supreme Court faced the issue of whether the "attenuation doctrine applies when an officer makes an unconstitutional investigatory stop; learns during that stop that the suspect is subject to a valid arrest warrant; and proceeds to arrest the suspect and seize incriminating evidence during a search incident to that arrest." *Utah v. Strieff*, 136 S. Ct. 2056, 2059 (2016).

2.   In a 5-3 decision, over a vigorous dissent, the Court overturned two unanimous state supreme courts (Utah and Nevada, see *Nevada v. Torres*, 136 S. Ct. 2505 (2016)) and held "that the evidence the officer seized as part of the search incident to arrest is admissible because the officer's discovery of the arrest warrant attenuated the connection between the unlawful stop and the evidence seized incident to arrest." *Id*.

3.   The Court reasoned that "there [was] no indication that this unlawful stop was part of any systemic or recurrent police misconduct . . . [rather] the stop was an isolated instance of negligence that occurred in connection with a bona fide

investigation of a suspected drug house." *Id*. at 263. The officer saw the defendant "leave a suspected drug house. And his suspicion about the house was based on an anonymous tip and his personal observations." *Id*. at 2063.

4.  The defendant in *Strieff* argued "that, because of the prevalence of outstanding arrest warrants in many jurisdictions, police will engage in dragnet searches if the exclusionary rule is not applied." *Id*. **The Court opined that such concern was not persuasive because "such wanton conduct would expose police to civil liability**." *Id*.

5.  Quite remarkably, the Royal Oak Police Department (hereinafter "ROPD"), at the direction of Chief Corrigan O'Donohue, since at least September of 2016 (three months after *Strieff*), has proudly enforced a policy of systematically and recurrently conducting dragnet searches to conduct warrant checks on individuals throughout the City of Royal Oak, without any reasonable suspicion of ongoing criminal activity.

6.  Pursuant to *Strieff*, as a matter of law, Royal Oak's policy to stop and frisk individuals to run warrant checks, without any reasonable suspicion of ongoing criminal activity, constitutes "wanton conduct" and exposes Defendants to civil liability.

7.    Lieutenant David Van Ness, of the ROPD, proudly explained to Plaintiff (after Plaintiff filed a Citizens' Complaint to notify the City of the unconstitutional and illegal activity) that despite violating so many constitutional standards, the ROPD does this "all the time" and that this policy allows the ROPD to "catch many people with warrants"; and thus, apparently, felt that the policy was justified. Chief O'Donohue formally responded to Plaintiff's Citizens' Complaint and confirmed that Lt. Van Ness "transparently" explained the ROPD policy and also found the policy justified.

8.    Since the City of Royal Oak has refused to correct this unconstitutional conduct, and has stated that such conduct is an active policy of the ROPD, punitive damages are necessary to punish and deter this conduct in the future.

9.    The Sixth Circuit has articulated a clear policy that when awarding punitive damages, specifically in cases in which there are little or no actual damages, the "less reprehensible conduct [is] . . . counteracted by the need to make the award large enough to actually punish and deter, something that is ordinarily not a challenge in civil rights cases." *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 650 (6th Cir. 2005). In *Romanski* the Sixth Circuit opined that a punitive

damages award of $600,000 was appropriate despite the plaintiff only being awarded $279.09 of compensatory damages.

10.   The ROPD's policy and response thereafter fosters the suspicion that such policies may be present at a plethora of other police departments around this country. A large punitive damages award is necessary to ensure that police departments are deterred from engaging in the conduct displayed in the instant case. Such a result will ensure that individuals' constitutional rights are respected; and, in turn, will help ensure that the police are respected themselves, so that they may effectively serve and protect their communities.

## PARTIES

11.   Plaintiff is a local attorney and resident of Royal Oak, County of Oakland, State of Michigan.

12.   Defendant City of Royal Oak Police Chief Corrigan O'Donohue is, and was at all relevant times herein, the Police Chief for the City of Royal Oak, and is and was responsible for, and the chief architect of, the policies, practices and/or customs of the ROPD, a municipal agency of the City of Royal Oak. He is and was, at all relevant times herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers

under his command who are or were employed by the ROPD, including Defendants named herein. He is sued in his individual and in his official capacity.

13. The City of Royal Oak is a city with a population of nearly 60,000 located in the County of Oakland, State of Michigan. The racial makeup of the city is 90.7% Caucasian.

14. Defendant Phillip Klinge (hereinafter "Klinge") is, and/or was, at all times relevant herein, an officer, employee and agent of the ROPD, a municipal agency of the City of Royal Oak. Klinge was involved in the underlying dispute giving rise to this Complaint. Klinge is sued in his individual capacity.

15. Defendant Mike Parmo (hereinafter "Officer Mike") is, and/or was, at all times relevant herein, an officer, employee and agent of the ROPD, a municipal agency of the City of Royal Oak. Officer Mike was involved in the underlying dispute giving rise to this Complaint. Officer Mike is sued in his individual capacity.

16. Defendant Nathan Heppner (hereinafter "Heppner") is, and/or was, at all times relevant herein, an officer, employee and agent of the ROPD, a municipal agency of the City of Royal Oak. Heppner was involved in the underlying dispute giving rise to this Complaint.

Heppner is sued in his individual capacity.

## JURISDICTION AND VENUE

17. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

18. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

19. 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure authorize plaintiff's claims for declaratory and injunctive relief.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as the events giving rise to the claim occurred in the Eastern District of Michigan.

21. Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

22. Defendants are properly joined pursuant to Fed. R. Civ. P. 20(a)(2) as Plaintiff's right to relief is asserted against them jointly, severally, or in the alternative with respect to the same series of

transactions and occurrences and questions of law or fact common to all Defendants that will arise in this action.

## FACTUAL ALLEGATIONS

23. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

24. Since 2009, the City of Royal Oak has hosted a festival known as Arts, Beats & Eats, which advertises itself as **"**Oakland County's Favorite Summer Festival Celebrating Art, Music, Cuisine & Community." See http://www.artsbeatseats.com.

25. The festival has become notorious in local news for regularly making the City nearly $100,000 off parking tickets alone. Royal Oak issued 1,595 parking tickets during the 2016 festival, at $50 per ticket, while only making two (2) arrests throughout the entire weekend. http://www.wxyz.com/news/region/oakland-county/royal-oak-issued-1595-parking-tickets-during-arts-beats-eats-festival; http://www.theoaklandpress.com/article/OP/20100910/NEWS/3091 09961 (1,900 tickets in 2010 totaling $95,000); http://www.detroitnews.com/story/news/local/oakland-county/2015/09/08/arts-beats-eats-parking-tickets-royal-oak/71904434/.

26.  In connection with the festival, the City of Royal Oak closes numerous streets in the area: "Washington between 2nd and Lincoln, Fourth, Fifth, Sixth, Seventh, Lincoln streets [*sic*] between Lafayette and Main, and Center st [*sic*] between third [*sic*] and seventh st [*sic*] . . . Most streets close for festival set-up at 6pm on Wed. August 31st, and reopen at 8am on Tuesday, September 6th." See http://artsbeatseats.com/festival-faqs/.

27.  Royal Oak advertises that, "Royal Oak Police will have representatives patrolling neighborhood [*sic*] for parking violations and unruly behavior. Report any concerns at anytime to Royal PD." See http://artsbeatseats.com/festival-faqs/. "The cost of Royal Oak Police and Firefighters will be covered from parking revenues, which we expect to more than cover all costs. There is the possibility that Police and Fire expenses don't get covered in case of bad weather or poor attendance and parking revenue." See http://artsbeatseats.com/festival-faqs/.

## THE 911 CALL

28.  Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

29.  On September 4, 2016, an apparent resident of 1409 Wyandotte in

the City of Royal Oak called 911. The caller, who never identified herself by name, was a female, and reported that it was "**not an emergency but there was a strange man who knocked on my door.**"

30.  The dispatch officer asked if "she saw what he looked like." The caller responded that her "husband answered the door" but stated, "I guess there was some guy and he was all by himself and he knocked on the door and said that the police had been around here, and he wanted to help us?" The caller then added, "I don't know, I'm just concerned."

31.  The dispatch officer asked, "What did your husband say to him?" The caller stated, "I don't know. Hang on."

32.  The caller then informed her husband that she had the police on the phone and asked him, "What did you say to him?"

33.  The caller then talked to her husband, and then said, "**I guess the guy said he wanted to help us, and my husband said what do you mean, and he didn't say anything and then he just walked away.**"

34.  The dispatcher asked, "Was it a white male, black male?"

35.  The caller then held a discussion with her husband, in which the

husband could be heard in the background indicating that he was a white male, about 5' 10", thin, and about twenty-five years old.

36. The dispatch officer then asked, "What was he wearing?" and the caller responded, "Here why don't you just talk to him."

37. The husband then took the phone and said, "Uhh, street clothes, I mean umm --"; the dispatch officer asked "jeans, shorts?"; the husband responded, "**jeans, and a shirt I guess. I don't know.**"

38. The husband seemed embarrassed that he couldn't give a better explanation and the dispatch officer assured him "that's okay."

39. The dispatch officer then asked, "What direction did he take off to?"

40. The husband responded, "Oh, he just walked, let's see I'm trying to think where I am, I'm going to get oriented here, he went west, we live on Wyandotte, so he walked west down Dondero toward Mohawk."

41. The dispatch officer asked how long ago it happened, and the husband confidently stated that it happened "five minutes ago." The husband added that it was his guess that the man was just "confused," but said he "did not" appear intoxicated and "that was the weird thing."

42. The dispatch officer asked the husband if he wanted to be seen by

the police or just have the police check the area, and the husband stated, "just have them check is fine."

43. Approximately two (2) minutes after the 911 call ended, the dispatch officer radioed vehicles 804 (Heppner) and 826 (Klinge). The radio call went as follows: "**Man knocks on the door, a white male, 5' 10', thin, about 25 years old, wearing jeans and a t-shirt, told the homeowner he wanted to help him, homeowner said he didn't need any help, closed the door, last seen west on foot on Dondero.**" 804 and 826 confirmed they heard the dispatch call.

44. An unknown officer then radioed, "815 will be checking Wyandotte Dondero area as well."

## INITIAL DETENTION OF PLAINTIFF

45. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

46. On September 4, 2016, over Labor Day weekend, Plaintiff, who is/was a local attorney and resident of Royal Oak, left a local business in downtown Royal Oak and began to walk down the sidewalk to his friend's house.

47. Due to the road closures as outlined in Paragraph 26 above, Plaintiff

was forced to walk around downtown Royal Oak, as opposed to straight thru, to get to his friend's house. Plaintiff had never walked those roads before and was unfamiliar with their names, although he certainly knew the general direction he was walking, and figured after he got a few streets up, the roads would no longer be closed, and he could cross back over to the roads he was familiar with.

48. However, while walking down the sidewalk (Plaintiff was walking north down Wyandotte at the intersection of Hudson and Wyandotte), Plaintiff was ordered to stop walking by Klinge. Klinge activated the overhead lights on his patrol car, positioned his patrol car in a diagonal manner so as to block passing traffic on the street, and stopped his vehicle in a manner so as to be directly fixated on Plaintiff.

49. Plaintiff, somewhat alarmed by the show of police authority in the area, and unsure whether he was being ordered to stop, looked around for anything else happening in the area.

50. Klinge then exited his vehicle and made clear that he was signaling for Plaintiff to stop. Klinge then apparently radioed for back up.

51. Klinge radioed, "826 [inaudible] male white shirt, blue jeans, I'll be on Wyandotte and Hudson."

52. Notably, Klinge never looked for any individual walking in the area where the 911 caller reported the individual to be walking, on Dondero, before stopping Plaintiff.

53. Klinge came forward towards Plaintiff in an aggressive manner and asked, "You alright man?"

54. Plaintiff responded, "**Yeah, I'm doing great.**" Klinge responded, "Okay."

55. Klinge further asked, "Are you, uhh, knocking on doors?"

56. Plaintiff succinctly responded, "I have not knocked on any door." Klinge responded, "Okay. I got a call, uhh, I got a call about a --- can you take your hands out of your pockets, take your ---"

57. Plaintiff promptly removed his hands from his pockets, and slowly raised his hands in the air so as to ask whether that is what Klinge wanted him to do.

58. Klinge confirmed that is in fact what he wanted and after Plaintiff raised his hands in air, stated, "Thank you. I appreciate it."

59. After Plaintiff raised his hands, Klinge explained the reason for the stop, which was that Klinge apparently "**just got a call about somebody wearing a white shirt, pants, knocking on doors.**"

60. Plaintiff, as an attorney, understood this was a scant amount of

descriptive information to receive about a suspect, and understood that such conduct did not amount to a felony and thus did not warrant any type of detainment.[1] Further, having already explained to Klinge that he had not knocked on any door, was alarmed, but remained respectful to Klinge and attempted to clear his name from this "investigation", and pointed out that he was wearing a pink shirt, thus, not even meeting this general description.

61. Klinge did not care that Plaintiff did not even meet this extremely vague description.[2]

62. Klinge, at this point seemingly unconcerned with any lawful police motive, then asked Plaintiff, "Where do you live at?"

63. Plaintiff cooperatively explained that he lives at "Fourteen (14) Mile and Crooks."

64. Klinge then asked Plaintiff, "What are you doing out here?" - in a tone to suggest that Plaintiff should not be there.

65. Plaintiff candidly explained, "Oh, I was just downtown at Arts, Beats & Eats."

---

[1] See MCL 765.15.

[2] In fact, Lt. Van Ness, in the recorded conversation, stated that the ROPD would not distinguish between types (t-shirt or dress shirt) or colors of shirts in deciding to stop a particular individual.

66. Klinge became agitated and demanded to know what Plaintiff was "doing in this neighborhood."

67. Plaintiff was growing increasingly confused as to where this was going, but explained he was "walking back to [his] friend's house."

68. Klinge then ordered Plaintiff to tell him where his friend lived.

69. Plaintiff explained that his friend lives on Fourth Street; however, did not know the other crossroad.

70. Plaintiff then noticed that Klinge had ordered back up on the scene and saw that another officer was approaching Plaintiff from behind.

71. Plaintiff grew increasingly nervous as two officers were now investigating "someone knocking on doors" and began to think the officers must suspect something much worse. As a result, Plaintiff tried to think of restaurants or other streets close by to his friend's, to alleviate any of their concerns that he may be from out of town, up to no good, or whatever those concerns might have been. Plaintiff explained, "I'm trying to think of where he lives," and stated, "It's by Chicken Shack, Fourth Street, and Eleven Mile is where it's by."

72. As this point, the other officer, later identified as Heppner, moved closer towards Plaintiff and asked if he had any ID on him. Plaintiff

confirmed that he did.

73.   While Plaintiff's arms were still in the air, pursuant to Klinge's order, Plaintiff had his right arm grabbed by Heppner, and had his left arm grabbed by another officer who silently approached Plaintiff from behind his left side. The officer that silently approached was later identified as Officer Mike.

74.   Both Officer Mike and Heppner grabbed Plaintiff directly on pressure points on both arms and began to slowly increase the pressure on both arms. This assault startled Plaintiff.

75.   Officer Mike and Heppner then began to pat down Plaintiff's pockets. Such conduct immediately made Plaintiff believe that the officers must not be investigating "someone knocking on doors" but rather must have mistakenly had a reason to believe Plaintiff was armed and dangerous.

76.   Officer Mike then removed Plaintiff's wallet from his back-right pocket without obtaining any consent, valid or otherwise.[3]

77.   Plaintiff in a nervous tone exclaimed, "What is the issue here?"

---

[3] "Where authority to search is based on consent, the government must establish "by a preponderance of the evidence, through clear and positive testimony, . . . that the consent was voluntary, unequivocal, specific, intelligently given, and **uncontaminated by duress or coercion**." *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015).

78. Klinge then got back to his earlier questioning and asked Plaintiff for the second time, "Were you knocking on any doors?"

79. Plaintiff, again proclaimed, "I have never knocked on anyone's door."

80. Klinge then for the third time asked, "No? Did you go to your friend's house and check -- check on his house?"

81. Plaintiff, again stated, "I did not." Klinge understood and said, "Okay. Alright."

82. Heppner then began his questioning, while Officer Mike began to look through the contents of Plaintiff's wallet.

83. Just like Klinge earlier, Heppner now asked Plaintiff for a second time, "Where do you live man?"

84. Plaintiff, again, but with more specificity, explained that he lived "at 14 and Crooks, in the Amber Apartments out there."

85. Heppner then asked Plaintiff, for the second time, "What are you doing down here?"

86. Plaintiff, once again, explained that he was downtown for Arts, Beats & Eats with his friends.

87. Heppner then asked Plaintiff for the second time, "Where does your friend live?" Plaintiff explained, again, that his friend lives "around

Eleven and Fourth Street."

88.  At this point, after looking through Plaintiff's wallet, Officer Mike removed Plaintiff's driver's license and began to read Plaintiff's driver's license number over the dispatch radio – to run a warrant check.

89.  Heppner then oddly responded to Plaintiff, "Okay. You're not close to that." Plaintiff was confused by this assertion, as he was four streets away from Fourth Street and seven streets away from Eleven Mile (while walking directly in that direction), and questioned, "Eleven and Fourth?"

90.  Heppner then, apparently to outsmart Plaintiff, stated, "You know Eleven and Fourth run parallel to each other?"

91.  Plaintiff was growing increasingly confused with the questioning and the officers' tone and explained he did not mean that the two roads were crossroads, but rather, "It's right in that area." Plaintiff further added, "Look, I didn't knock on anyone's door, **I'm not sure what the issue is to be honest with you.**"

92.  Officer Mike, now done reading Plaintiff's driver's license number over the radio, explained, "**We're just checking some things out, you fit a description of someone knocking on doors.**"

93. Plaintiff did not understand how that was a crime or how any further questioning would aid the investigation and grew increasingly concerned with what was happening.

94. At this point in time, a fourth unknown officer drove up in his patrol car and parked to the right of Plaintiff. [4]

95. After seeing the fourth officer arrive, Plaintiff became even more confused and worried by the presence of this many officers, and found it hard to believe these officers were simply investigating "someone knocking on doors."

96. Plaintiff again tried to clear his name from this apparent investigation of an alleged past nuisance committed in the area, and stated the only thing he could, "Okay, it was not me."

97. Despite Plaintiff's denial, Officer Mike stated Plaintiff was not free to leave until "everything pans out."

98. Plaintiff was extremely concerned that there seemed to be no way for this to "pan out" in his favor, as he couldn't see any way for him to prove a negative, namely, that he did not knock on any door in the area.

99. Heppner then walked over to the fourth patrol car that had now

---

[4] Lt. Van Ness informed Plaintiff that this was a supervisor, however, his name was not revealed by the ROPD.

parked to the right of Plaintiff. Heppner approached the fourth officer, who had exited his vehicle, and stated, "Okay, I'm sure this is him. I mean there is four of us here and no one else has seen one. I came from the west."

100. Klinge then asked Plaintiff, "Where is your car --- put your hands down and relax. Just-just-j"

101. Officer Mike then joined, "Yeah, put your hands down dude."

102. Plaintiff now had four (4) officers surrounding him, with police overhead lights activated, had been frisked, had his wallet removed from his pocket without his consent, and had still not received it back, and thus, Plaintiff was understandably nervous, and wanted to make sure he understood the officers, and asked, "you just told me to take my hands out of my pockets?" and expressed that he didn't "want any problems."

103. Officer Mike said, "Dude, calm down."

104. Klinge added, "That's fine, you can keep your hands down, just keep them out of your pockets."

105. Plaintiff said, "okay," and complied with the officers' new demand to keep his hands down yet out of his pockets.

106. Klinge then asked, "You got a car anywhere?"

107. Plaintiff, assuming he meant in the area and not anywhere, stated, "No, my car is not here." Plaintiff explained that he had taken an Uber to Arts, Beats & Eats and met up with his friends.

108. Klinge then asked Plaintiff, for the third time, "Where are you going right now?"

109. Plaintiff, once again, responded, "I'm trying to get back to my friend's house."

110. Officer Mike then asked, once again, "Where is that again?"

111. Klinge in an apparent attempt to demean Plaintiff, stated, "He said around like Eleven and Fourth, but that doesn't make sense."

112. Plaintiff said, "It's around like Chicken Shack on Eleven Mile."

113. Officer Mike then asked Plaintiff if he knew what road he was currently walking down.

114. As explained above, due to the road closures as outlined in Paragraph 26 above, Plaintiff was forced to walk around downtown Royal Oak, as opposed to straight thru, to get to his friend's house. Plaintiff had never walked those roads before and was unfamiliar with their names, although he certainly knew the general direction he was walking. Thus, Plaintiff candidly told the officers that he did not know the road he was on, but again explained, he "had not been

knocking on anyone's doors."

115. Klinge, in an aggressive tone, then asked, "How much have you had to drink?"

116. Plaintiff was fed up with the questioning, did not answer Klinge's question, and rather inquired into the reason for the question; Plaintiff responded, "**I frankly am not sure. Is there a problem with what I am doing?**"

117. Klinge, clearly upset, leaned forward and aggressively responded, "**Look I told you man. We got a call about somebody knocking on doors that matches your description.**"

118. Plaintiff was unsure of what else to say to make this "pan out" so that he could go on his way per Officer Mike's orders, again clarified, "**Okay, I did not knock on anyone's door.**"

119. Klinge, again said, "Okay."

120. Officer Mike then oddly stated, "No one is saying that you did. We're just asking, that's why we're out here, okay? That's it. That's all."

121. Plaintiff realized if this were in fact a true statement, this stop would be unquestionably unconstitutional, and stated, "Okay, okay, and I'm telling you I didn't, that's all I'm saying."

## <u>CONTINUED DETENTION OF PLAINITFF</u>

122. Klinge then asked, "Do you need us to call you a taxi or an Uber?"

123. **Plaintiff, unequivocally, specifically, and intelligently stated "<u>no, not at all</u>."**

124. Klinge clearly did not really care if Plaintiff needed a ride and stated, "Okay, cause' you're trying to get really far from here and **<u>we can't just have you walking around on the street.</u>**"

125. Plaintiff physically reacted in a manner to show his disbelief in Klinge's statement, as he had never heard of this rule in the United States of America.

126. Officer Mike, however, confirmed this Royal Oak policy and stated, "Where you're going, you're a long ways away."

127. Plaintiff, as an attorney, realized his recourse is in a courtroom and not on the street, and acquiesced to the officers' authority and said, "okay."

128. Klinge stated, "**We can call you a taxi, that's not a problem.**"

129. At this point in time, the radio dispatch confirmed that there were no warrants issued on Plaintiff and that he was "all clear."

130. Plaintiff, figuring that he had no other way to leave, responded to Klinge, "**that would be great. I would appreciate it. I'm trying to**

**go to my friend's house. Again, it's on Fourth Street.**"

131. Klinge then asked "Do you know his address? Can you tell a taxi where it is so he can take you there?" Plaintiff confirmed that he could tell a taxi how to get there, but conceded that he did not know the address. Plaintiff was anxious to leave, and stated that if they had somewhere to plug his phone in, he would be able to find the address in the phone.

132. Klinge asked, "What kind of phone do you got, you got an iPhone?" Plaintiff confirmed that it was in fact an iPhone. However, despite this suggestion given by Klinge, the officers did not allow Plaintiff to plug his phone in.

133. Plaintiff, still hoping to make everything "pan out" so he could just walk away, explained, "I can assure you, I have not knocked on anyone's door, I'm an attorney, I have no interest in breaking the law." However, the radio dispatch reported an incident at Beaumont Hospital as Plaintiff said this, and it was unclear if the officers heard him.

134. Klinge then immediately stated, "It's my beat, I'll get it."

135. Officer Mike then announced, "he checks clear," and assured Klinge he could leave.

136. Officer Mike then, for the second time, inquired into what kind of phone Plaintiff had, and again, Plaintiff stated that it was an iPhone.

137. Heppner then asked Plaintiff for his friend's phone number to which Plaintiff explained he doesn't know off the top of his head. Heppner, couldn't believe such a statement, and asked, "really?"

138. Plaintiff did not understand what was going on with these questions and the continued detainment, yet again offered to provide the information to Heppner if he was able to plug his phone in, but explained, "I don't just memorize my friend's phone numbers."

139. Heppner then apparently gave Plaintiff some advice to "help" Plaintiff, and stated, "that would probably be something -- you probably want to memorize someone's phone number, you can't be so reliant on technology."

140. Officer Mike then finally handed Plaintiff back his wallet.

141. Plaintiff again made clear that he did not need the officers' help, and responded that "if I was in an issue, there are people's phone numbers that I remember."

142. Officer Mike then for some innocuous reason, demanded to know Plaintiff's own phone number. Officer Mike excitingly stated, "What's your phone number? What is your phone number?"

Plaintiff, growing increasingly confused, asked, "my phone number?"

143. Officer Mike, clearly frustrated, responded, "yours, yep."

144. Plaintiff cooperatively supplied his own phone number, which was then later published by the City of Royal Oak in response to Plaintiff's FOIA Request, and Officer Mike wrote the number down on his note pad (although, noticeably, this "note" was not turned over nor denied for any reason in response to Plaintiff's FOIA Request).

145. Officer Mike then stated, "Here's the thing, dude, you're way off from where you said you need to be, from where you're trying to get to, **we're trying to get you out of here, that way no one calls on you again, we're not back down here wasting our time on you, okay?"**

146. Plaintiff, after having his time wasted for the last ten (10) minutes, again made clear that he does not want the officers' help, and stated, "**Listen, I do not want to make you waste your time whatsoever.**"

147. Officer Mike expressed that he didn't care what Plaintiff wanted, and stated that that he would get Plaintiff "downtown . . . at least get

him out of here."

148. Apparently, the stated "plan", to order Plaintiff a taxi (see Paragraphs 128-130), was no longer the officers' plan with Plaintiff.

149. Plaintiff was unaware as to what would happen next, and was hoping to finally be done with this situation, stated, "I would appreciate it. I haven't been knocking on anyone's doors, I have not been talking to anyone."

150. The officers stared at Plaintiff without saying anything, so Plaintiff hoping to deescalate the rising tension stated, "but if you could take me downtown that would be great."

151. Officer Mike stated, "Well, I don't see anyone else out here, you're the only guy I ran into, a couple blocks around here."[5]

152. Heppner added, "You're the only guy that four officers have ran into."[6]

153. Officer Mike again reiterated his belief that Plaintiff was lying and stated, "If you did, you did."

---

[5] Upon later review of the video footage, it became clear that Officer Mike failed to even look in the suspected area and simply just went to where Klinge radioed from and where Klinge had his lights activated.

[6] Again, video footage revealed that none of the four officers had actually conducted any surveillance in the correct area and simply all responded to Klinge's dispatch call and his activated lights.

154. Plaintiff, responding to the officers' "story" that they had checked a few blocks and only saw Plaintiff, responded, "**I guess that's true man, I didn't, I don't know what you're talking about.**"

155. Officer Mike again made clear that he did not believe Plaintiff and stated, "You're lost or whatever, I get it, whatever,"

156. Plaintiff of course did not appreciate being called a liar, and again stated, "**Alright, I didn't knock on anyone's door, it's frankly very strange to be accused of, I'm just walking down the street.**"

157. Officer Mike expressed his understanding that no laws were broken and responded, "we didn't say you beat someone's door in, or kicked it in, we said you knocked on the door -" Plaintiff interjected, "yeah, I didn't." Officer Mike continued, "-- someone got spooked, and here we are."

158. Plaintiff did not appreciate the continued suggestion that he knocked on doors in the area, and stated, "**Alright, it's not me, I don't know who did that, it's a weird thing to do.**"

159. Heppner was clearly upset and responded, "**Perfect.**"

## THE "RIDE"

160. Officer Mike then began to walk towards his patrol car and told Plaintiff to follow him. Plaintiff was unsure if he was being arrested

or if the officers planned to give him a ride, and stated, "If you could take me downtown, I would appreciate it. Thank you."

161. Heppner then walked back to his own patrol car.

162. Officer Mike asked, "Rock on Third is where you want to go?" Plaintiff was confused by the question, but clarified, "it's Fourth Street."

163. Once Plaintiff got to Officer Mike's patrol car, Officer Mike then said, "**Hold on a sec, alright, before you hop in, you got anything on you?**" Officer Mike added, "Just for my own safety," pointed to the top of his vehicle, and ordered Plaintiff, **"grab hold of that up there."**

164. Plaintiff was alarmed as to what was happening, and asked, "Am I under arrest or something?"

165. Officer Mike, clearly bothered, responded, "You're not under arrest. Anyone I put in my car, I pat them down."

166. Plaintiff explained, "I'm just asking."

167. Officer Mike became more agitated and stated, "No dude, you're not under arrest."

168. Plaintiff began to think about whether he wanted to get frisked, however, before Plaintiff could decide, Officer Mike aggressively

grabbed the contents of Plaintiff's left front pocket and said, "Just tell me what's in here."

169. Plaintiff looked at Officer Mike, startled, and answered, "keys and Altoids."

170. Officer Mike then said, "I don't want someone getting in my backseat if they've got a gun. You see my point?" After just being assaulted, Plaintiff did not respond.

171. Officer Mike then opened the back door of his patrol car and moved Plaintiff inside.

172. Heppner waited for Plaintiff to be secure in the back of patrol car, then rolled down his window and pulled his patrol car forward, and stated to Officer Mike through the window, "I'll just follow you up there."

173. Officer Mike got into the driver's seat of his patrol car and asked Plaintiff, "What's your first name again?" Plaintiff responded "Joe." Officer Mike then began to drive forward.

174. Plaintiff then asked Officer Mike, "What's your name?"

175. Officer Mike, seemingly upset at Plaintiff's question, pulled his car to the side of the road.

176. Once stopped, Officer Mike responded, "**I'm Officer Mike.**"

177. **Plaintiff asked, "Officer Mike? What's your last name?" Officer Mike never responded.**

178. Plaintiff was now extremely uncomfortable because the officer had pulled to the side of the road, would not provide his name, and so he felt the door of the patrol car for a handle so that he could leave and go on his way; however, Plaintiff realized the back doors in the patrol car do not allow a passenger to exit from the inside.

179. Plaintiff now realized he was locked in the patrol car on the side of the road.

180. Heppner then pulled his vehicle next to Officer Mike's and the two held a short discussion. Heppner then announced his plan to detain Plaintiff further and elicit further information from him; Heppner asked Officer Mike, "**Do you want to just see if you could get a name for his friend, and just CLEMIS search his friend? Instead of just throwing him back on the street, maybe we could uhh ---**"

181. Officer Mike apparently knew where Heppner was going, as if this was a common occurrence, and interjected, "yeah."

182. Officer Mike then turned to Plaintiff, who was now locked in the backseat of the patrol car, and asked Plaintiff (despite never asking

Plaintiff the question before), "What's your buddy's name again?"

183. Plaintiff nervously stated, "My buddy's name is Zach."

184. Officer Mike then stated, "let's see if we can find where he lives."

185. Plaintiff did not know what Officer Mike was doing, and again stated if Officer Mike had an iPhone charger, he would plug his phone in and "tell him the exact address." Officer Mike did not respond.

186. At this point, a "radio call" reported that another individual was detained and suspected of being the individual identified by the 911 call. Officer Mike asked Heppner, "You wanna go check him out, see if he's good? **I'll wait right here, I'm just gonna run his buddy.**"

### PLAINTIFF'S REVOCATION OF CONSENT (ASSUMING ANY WAS GIVEN TO BEING WITH)

187. Plaintiff, after hearing that he would be held on the side of the road for some unspecified period of time, until Heppner came back, asked Officer Mike, **"Am I free to leave the vehicle?"**

188. Officer Mike oddly responded, **"Yeah, you're good,"** but did not allow Plaintiff to leave, and continued, "I'm just trying to get your buddy's name so I can get you to your buddy's instead of taking you to rock on third."

189. Despite Officer Mike's statements to the contrary, Plaintiff was clearly not "good", nor free to leave the vehicle.

190. Plaintiff was not sure why he was now being held on the side of the road, and was nervous as to what would happen next, and stated, "If you could just go to rock on third that would be great. I didn't knock on any door."

191. Officer Mike had no interest in anything Plaintiff wanted. Rather, Officer Mike posed even more questions to Plaintiff. Officer Mike began to talk over Plaintiff's request, and loudly yelled, "Is it Zachary or Zach, is it Zachary?"

192. Plaintiff grew increasingly worried about Officer Mike's tone, and acquiesced to his authority and stated, "His name is Zachary, yeah."

193. About five (5) seconds of silence passed, and Plaintiff said, "listen, if I'm not --"

194. Officer Mike cut Plaintiff off and yelled, "Dude!" Plaintiff continued, "If you're not going to take me, I'll just walk."

195. Officer Mike aggressively responded, "Listen to me! I'm gonna take you, calm down! Why are you so uptight?"

196. Plaintiff, clearly distraught, logically explained, "Because I'm in the back of a police car."

197. Officer Mike became irate and yelled, "Dude you're not under arrest, listen to me, listen to me!! You're not under arrest, you're not in trouble, I'm doing you a favor, I'm trying to get you out of here so no one else calls on you, that's the thing, we've had, listen this is what's going on, we've had a ton of B and E's down here, obviously it's not you, if I leave you down here, someone's gonna call on you again, and we're gonna come back out here again, I'm trying to avoid that for you!"

198. After dismissing repeated requests to leave the vehicle and harassing Plaintiff for the last 10-15 minutes, Plaintiff sarcastically responded, "well I appreciate it."

199. Officer Mike then said, "Do you know Zachary's last name?"

200. Plaintiff paused and said, "Are you looking up his address? He rents the place."

201. Officer Mike then became furious, and angrily responded, "Dude, listen to me! What is his name? Listen to me!! What is Zachary's last name?! I'm trying to get you there dude!!"

202. Plaintiff was extremely bothered by the continued questioning, the length of time he was being held in the back of the patrol car on the side of the road, as well as Officer Mike's demeanor and tone, and

stated, "**I'll just walk to there, okay?**"

203. **Officer Mike, in an increasingly agitated state, refused Plaintiff's request to leave again, and this time immediately 'gunned' the patrol car forward.**

204. Naturally, this terrified Plaintiff as no explanation was given and Officer Mike gave no indication as to where he was taking Plaintiff.

205. Plaintiff nervously waited for Officer Mike to say something, but as nothing was said, Plaintiff again asked, "**Am I free to leave? Or am I under arrest?**"

206. Officer Mike refused to respond to Plaintiff's question. Instead, Officer Mike radioed, "I'll be taking Joe down to the Rock on Third and dropping him off."

207. Officer Mike then fumingly said to Plaintiff, "There! Are you happy?"

208. Plaintiff responded, "No. I'm just asking if I can leave the vehicle?"

209. Officer Mike's rage then seemed to reach its peak, and he shouted, "What did I tell you the first time?! Dude! I said you're not under arrest! What don't you understand about that?!"

210. Plaintiff clarified, "I'm asking to get out of the vehicle."

211. Officer Mike again denied Plaintiff's request and explained, "I'm

getting you out of here. You wanted to go to Rock on Third, I'm taking you to Rock on Third."

212. Plaintiff again explained, "I'm requesting to get out of the vehicle."

213. Officer Mike responded, "Okay, right over here."

214. However, Officer Mike's speed increased and he did not let Plaintiff out anywhere that could be considered "right over here."

215. Officer Mike then said, **"I'm getting you out of here dude, I don't want anyone to call on you, you're not under arrest, I'm getting you <u>out of dodge</u>, because <u>otherwise other officers are gonna roll up on you and they're gonna throw you in the back of their car</u> and you're going to go through this again. I'm doing you a favor!"**

216. Plaintiff remained calm, and politely stated, "Sir, I'm requesting to leave the vehicle."

217. Officer Mike responded, "You're going to leave the vehicle dude, I'm not leaving you right here," and again incorrectly stated, "you're a long ways off from where you need to be."

218. Plaintiff, again politely responded, "Sir, I'm requesting to leave the vehicle."

219. Officer Mike responded, "Dude! You're going to leave, I'm not

dropping you off on Lincoln Street."

220. Officer Mike then expressed his true concern was not with Plaintiff's well-being, but rather his fear that he may "get in trouble" if he allowed Plaintiff to leave the vehicle.

221. As Officer Mike continued down Lincoln St., Officer Mike passed Troy Street, which Plaintiff knew was the clear path to Rock on Third. Plaintiff was now extremely concerned as to where he was being taken.

222. Plaintiff stated, "There's no way for me to get out back here." Officer Mike, explained his pleasure in hearing that, and stated, "exactly."

223. Plaintiff said, "So you're not allowing me to leave."

224. Officer Mike strangely denied this and said, "No, I'm getting you out of here. You asked me to take you to Rock on Third."

225. As stated above, Officer Mike passed the road he would have turned on, Troy Street, had he actually been going to Rock on Third.

226. Plaintiff then used his argument of last resort and stated, "Sir, once again, I'm an attorney."

227. Officer Mike, clearly realizing the illegality of his actions, reacted to Plaintiff's statement by immediately hitting his brakes and stating,

"Here, here you go," and pulled into the gas station he was passing at Lincoln and Main St.

228. Officer Mike then stopped the patrol car and turned to Plaintiff in the back seat and yelled, "Listen to me! Listen to me! You're allowed to leave the vehicle. Here you go. Here you go. You're downtown, now get outta here!"

229. Officer Mike, clearly aware that Plaintiff was locked in the back, exited his patrol car, opened the back door to let Plaintiff out, and stated, "You're free to go dude, you're downtown."

230. Plaintiff, despite being taken far off from where he was attempting to walk to, remained respectful, and stated, "I appreciate it."

231. Officer Mike did not watch to see Plaintiff walk away, but rather immediately "took off" back down Lincoln St. Video footage later obtained via Plaintiff's FOIA request showed Officer Mike going 51 MPH, and rising as the video cut off, down Lincoln St. (which is a 25 MPH road).

232. Although Plaintiff was approximately a half-mile from his friend's house when originally stopped by Klinge, it took Plaintiff over forty (40) minutes to walk back to his friend's house from the gas station at Lincoln and Main.

233. When Plaintiff finally got back to his own apartment, Plaintiff realized that when Officer Mike aggressively grabbed the keys and Altoids in his front left pocket, Officer Mike bent Plaintiff's apartment key; as a result, Plaintiff was unable to reenter his apartment complex. Plaintiff was forced to get the key straightened at Ace Hardware in West Bloomfield, Michigan. The key was straightened enough so that he could get into his apartment, however, the key remains difficult to use, and is no longer used by Plaintiff because of Officer Mike's actions.

## POST-DETENTION FACTS

234. On September 8, 2016, the very next business day, Plaintiff submitted a Freedom of Information Act ("FOIA") request to the Royal Oak Police Department to obtain all information related to this incident. **Exhibit A, FOIA Request**.

235. In response to his FOIA request, Plaintiff received three (3) videos, a CD containing the 911 call, as well as the attached documents. **Exhibit B, Documents Received Pursuant to FOIA**.

236. Upon review of the videos, Plaintiff realized that there was no video or audio footage from Klinge, the officer who initially stopped him. Rather, the City of Royal Oak accidently provided video footage of

another individual who was walking east down Dondero, who was also stopped by the ROPD as a result of this same 911 call. Thus, it became apparent to Plaintiff that he was not the only person the officers saw in the area, despite their assurance of the same, and became even more confused as to what transpired.

237. Plaintiff returned the incorrect video to the City and requested the correct video footage. Although the City first told Plaintiff that the video footage could not be found, after Plaintiff's insistence as to the video or written confirmation that such video does not exist, the City found the video but stated that no audio was available.

238. After reviewing the correct video footage, Plaintiff filed a Citizens' Complaint with the ROPD, pursuant to the department's policy "to accept and investigate all complaints of employee misconduct or wrongdoing." **See Exhibit C, Citizens' Complaint**.

239. After filing the Citizens' Complaint, Plaintiff held an approximately two (2) hour meeting with Lt. Van Ness of the ROPD. Lt. Van Ness asked Plaintiff if it would be okay if the conversation was recorded. Plaintiff agreed that a recording would be helpful to all involved. Lt. Van Ness is in possession of such recoding, but refused to provide a copy to Plaintiff. **See Exhibit D, E-Mails from Lt. Van Ness**.

240. During the conversation, Lt. Van Ness explained that the ROPD does this "all the time" and proudly explained that it allows the ROPD to find many people with warrants. Lt. Van Ness further stated that officers usually just drop people off at the bus stop if they do not have a warrant.

241. Lt. Van Ness explained to Plaintiff that it's the ROPD's policy that any individual stopped by the police must turn over their identification, or the police have the right to forcibly take the identification.

242. Lt. Van Ness further explained to Plaintiff that the ROPD doesn't "just ignore 911 calls", regardless of whether any illegality is asserted in the call, and further explained in this situation, the 911 call created "reasonable suspicion" that Plaintiff "may" have engaged in criminal activity in the past by knocking on a door any walking away.

243. Lt. Van Ness indicated that it is the ROPD's policy to stop individuals if there is a 911 report indicating "open intoxication", regardless of whether the officers witness any suspicious activity themselves.

244. Finally, Lt. Van Ness assured Plaintiff that he would interview all

the officers involved and would provide a report to the Chief.

245. On January 2, 2017, ninety (90) days after Plaintiff filed his Citizens' Complaint, Chief O'Donohue sent a one (1) page letter to Plaintiff. **See Exhibit E, Letter from Chief Corrigan O'Donohue**.

246. Chief O'Donohue's letter stated that Lt. Van Ness's meeting with Plaintiff was not an "investigation" but rather was to "clear up a few potential misunderstandings that seem to stem from [Plaintiff's] misunderstanding" of Royal Oak's policies and procedures. Chief O'Donohue confirmed that Lt. Van Ness was "transparent" about Royal Oak's policies. Chief O'Donohue found that the officers did not "engage in any improper conduct." Lastly, Chief O'Donohue praised the professionalism of the officers and stated that the officers were "simply attempting to help" Plaintiff. **See Exhibit E, Letter from Chief Corrigan O'Donohue**.

247. It remains unclear how detaining Plaintiff, assaulting Plaintiff, and running a warrant check on Plaintiff would "help" Plaintiff in any manner whatsoever.

## VIOLATIONS OF FEDERAL LAW

### COUNT I: SEARCH AND SEIZURE OF PERSON
### IN VIOLATION OF 42 U.S.C. § 1983
*(Against All Individual Defendants)*

248. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

249. Chief O'Donohue, Officer Mike, Heppner, and Klinge are "persons" for purposes of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, acted under color of state law.

250. At all relevant times, Chief Corrigan O'Donohue had final policy making authority.[7] Under information and belief, Chief O'Donohue created and oversaw the policy that was executed by Officer Mike, Heppner, and Klinge on September 4, 2016 to accomplish the search and seizure of Plaintiff.

251. Chief O'Donohue, Officer Mike, Heppner, and Klinge acting

_____

[7] Sec. 12-46. - Duties.

The chief of police shall be the ranking administrative officer of the police department, as established in division 3 of this article, and shall be responsible to the township board for the efficient administration the department. In addition, the chief of police shall perform the following functions and duties:

(4) Ensure that those police officers and other personnel in the police department are qualified, and comply with appropriate rules and regulations in the performance of their functions and duties;

individually and in concert, conspired to initiate a seizure of Plaintiff's person on September 4, 2016.

252. At the time that Defendants agreed to this, (1) probable cause did not exist to believe that a crime had taken place or that criminal activity was afoot; (2) reasonable suspicion did not exist to suspect that criminal activity was afoot; (3) reasonable suspicion did not exist that Defendants were dealing with an armed or dangerous individual; (4) reasonable suspicion did not exist to investigate any *particular* individual; (5) there were no grounds for believing that a pat down search could be conducted to discover a wallet, since the purpose was not to seize a weapon; (6) there was no authority under the "community caretaking" function to "help" Plaintiff get back to his friend's house without Plaintiff's consent; (7) there were no grounds for believing that Plaintiff was in an emergency situation; and (8) Plaintiff did not provide his consent.

253. Chief O'Donohue acted willfully, intentionally, maliciously, with bad faith and ill will by creating and overseeing a policy that disregarded all the factors described in Paragraph 252.

254. Officer Mike, Heppner, and Klinge knew that the requisite grounds did not exist to justify the search and seizure of Plaintiff, and all

acted willfully, intentionally, maliciously, with bad faith and ill will in implementing a policy that disregarded all the factors described in Paragraph 252.

255. No reasonable officer would have believed that the facts, as they actually existed, provided sufficient grounds for an investigatory stop of Plaintiff; nor a self-protective search for weapons; nor any further detainment; nor that it was an appropriate exercise of the "community caretaking" function of the police.

256. Further, Officer Mike rummaged through Plaintiff's wallet to look through his personal belongings, without issuance of any notice, subpoena or warrant, or other legal process, and in the absence of probable cause or reasonable suspicion. Defendants compounded these violations of Plaintiff's constitutional rights by reading Plaintiff's driver's license number, full name, date of birth, and residence over the dispatch radio and published such information for public viewing via the Freedom of Information Act ("FOIA") to further the public humiliation, outrage, infamy, and stigmatization.

257. As a result of Defendants' conduct, Plaintiff was subjected to an unconstitutional search and seizure in deprivation of his Fourth and Fourteenth Amendment rights.

258. As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered loss of privacy, loss of property, loss of liberty, irreparable harm to his reputation, economic loss, humiliation, sense of outrage and indignity.

### COUNT II: SEIZURE OF WALLET/DEPRIVATION OF PROPERTY IN VIOLATION OF FOURTH AMENDMENT AND 42 U.S.C. § 1983
*(Against All Individual Defendants)*

259. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

260. Chief O'Donohue, Officer Mike, Heppner, and Klinge are "persons" for purposes of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, acted under color of state law.

261. At all relevant times, Chief O'Donohue had final policy making authority. See Footnote 6 above. Under information and belief, Chief O'Donohue created and oversaw the policy that was executed by Officer Mike, Heppner, and Klinge on September 4, 2016 to accomplish the search and seizure of Plaintiff's wallet and the contents therein.

262. Chief O'Donohue, Officer Mike, Heppner, and Klinge individually and in concert, conspired to deprive Plaintiff of his possessory interest of his wallet and the contents therein.

263. The conspiracy to deprive Plaintiff of his possessory interest in his wallet was connected with the other deprivations of Plaintiff's federally protected rights alleged herein, and was motivated by a malicious and evil intent to deprive Plaintiff of his dignity and freedom from arbitrary police interference.

264. As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of his rights under Article IV of the United States Constitution, and the Fourth, Fifth, and Fourteenth Amendments thereto.

265. As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered loss of privacy, loss of property, loss of liberty, irreparable harm to his reputation, economic loss, humiliation, sense of outrage and indignity.

## COUNT III: ABUSE OF PROCESS AND CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983
### *(Against All Individual Defendants)*

266. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

267. Chief O'Donohue, Officer Mike, Klinge and Heppner, individually and in concert, subjected Plaintiff to an unconstitutional search and seizure.

268. At all relevant times, Chief Corrigan O'Donohue had final policy making authority. See Footnote 6 above. Under information and belief, Chief O'Donohue created and oversaw the policy that was executed by Officer Mike, Heppner, and Klinge on September 4, 2016 to accomplish the abuse of process and conspiracy in the present case.

269. The conduct of the officers was malicious and evinced a callous disregard for and deliberate indifference to Plaintiff's constitutional rights.

270. As a result of the wrongful application of clearly established constitutional standards, Plaintiff's person, papers and effects were seized and searched without probable cause or reasonable suspicion in deprivation of his rights guaranteed by Article IV of the United States Constitution and the Fourth and Fourteenth Amendments thereto.

271. As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered loss of privacy, loss of property, loss of liberty, irreparable harm to his reputation, economic loss, humiliation, sense of outrage and indignity.

**COUNT IV: *MONELL* LIABILITY UNDER 42 U.S.C. § 1983**
*(Against City of Royal Oak Police Chief Corrigan O'Donohue in his Official Capacity)*

272. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

273. A local unit of government can only be held liable under Section 1983 when the alleged constitutional violation was caused by "a policy statement, ordinance, regulation or decision officially adopted or promulgated . . . [or for] deprivations visited pursuant to a governmental custom." *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 690-91 (1978).

274. At all relevant times, Chief Corrigan O'Donohue had final policy making authority. See Footnote 6 above.

275. The City of Royal Oak has a policy statement, ordinance, regulation or decision officially adopted or promulgated, or a custom of: conducting unconstitutional searches and seizures of individuals' persons, papers and effects without reasonable suspicion or probable cause that criminal activity may be afoot or reasonable suspicion or probable cause that "help" is needed, and; conducting unconstitutional seizures of individuals' identifications so that they may illegally run warrant checks on the unconstitutionally stopped

individuals.

276. Lt. Van Ness, of the ROPD, explained that the ROPD does this "all the time" and proudly explained that it allows the ROPD to find many people with warrants.

277. Chief O'Donohue confirmed that Lt. Van Ness was "transparent" about Royal Oak's policies and procedures. Chief O'Donohue found that the officers did not "engage in any improper conduct" and that the officers acted pursuant to policy.

278. This policy was created maliciously, willfully and wantonly.

279. As a result of the creation of a policy based on the wrongful application of clearly established constitutional standards, Plaintiff's person, papers and effects were seized and searched without probable cause or reasonable suspicion in deprivation of his rights guaranteed by Article IV of the United States Constitution and the Fourth and Fourteenth Amendments thereto.

280. Further, the City of Royal Oak has a policy of inadequate training, which amounted to a deliberate indifference to the rights of persons with whom the police come into contact. Specifically, the City of Royal Oak failed to train their officers to understand any of the relevant law regarding "stop and frisk", "community caretaking",

and MCL 764.15.

281. As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered loss of privacy, loss of property, loss of liberty, irreparable harm to his reputation, economic loss, humiliation, sense of outrage and indignity.

## STATE LAW CLAIMS

### COUNT V: FALSE IMPRISONMENT/ARREST
*(Against All Individual Defendants)*

282. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

283. Defendants caused Plaintiff to be confined in actual boundaries not of his choosing, both on the street, and within the back of Officer Mike's patrol car.

284. Defendants deprived Plaintiff of his personal liberty and freedom of movement with the intention of confining him.

285. Plaintiff was conscious of his confinement at all times relevant hereto.

286. The imprisonment and restraint were against Plaintiff's will.

287. Defendants accomplished the imprisonment and restraint by actual physical force, and the deprivation of Plaintiff's liberty and freedom was intentional, unlawful, unprivileged, and without probable cause.

288. In addition to the initial restraint and deprivation of personal liberty and freedom of movement being unreasonable, the continued detention and investigation were unreasonable.

289. There was no legal justification for the continued detention of Plaintiff in the back of Officer Mike's patrol car, nor did the officers claim a legal justification; rather, Officer Mike stated numerous times that he was imprisoning Plaintiff as a "favor."

290. As a direct and proximate result the officers' false imprisonment, detention, and investigation of Plaintiff, Plaintiff suffered loss of privacy, loss of property, loss of liberty, irreparable harm to his reputation, economic loss, humiliation, sense of outrage and indignity.

### COUNT VI: CONSPIRACY TO COMMIT FALSE IMPRISONMENT/ARREST
*(Against Officer Mike and Heppner Arising out of Detainment in Patrol Car)*

291. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

292. Defendants Officer Mike and Heppner illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of falsely imprisoning/arresting Plaintiff.

293. Defendants Officer Mike and Heppner, in combination, conspired to

hold Plaintiff in the backseat of Officer Mike's patrol car for an undetermined amount of time - the only indication given was that he was to be detained at least until Heppner returned from checking on another "investigation."

294. Defendants caused Plaintiff to be confined in actual boundaries not of his choosing within the back of Officer Mike's patrol car.

295. Defendants deprived Plaintiff of his personal liberty and freedom of movement with the intention of confining him.

296. Plaintiff was conscious of his confinement at all times relevant hereto.

297. The imprisonment and restraint were against Plaintiff's will.

298. Defendants accomplished the imprisonment and restraint by actual physical force, and the deprivation of Plaintiff's liberty and freedom was intentional, unlawful, unprivileged, and without probable cause.

299. There was no legal justification for the detention of Plaintiff in the back of Officer Mike's patrol car, nor did the officers claim a legal justification; rather, Officer Mike stated numerous times that he was imprisoning Plaintiff as a "favor."

300. The purpose of this conspiracy was for the illegal, unlawful, and tortious activity of false imprisonment/arrest.

301. The officers' discussion, as described in Paragraph 180-86, demonstrated concerted action.

302. As a direct and foreseeable consequence of this concerted action, Plaintiff has suffered loss of privacy, loss of property, loss of liberty, irreparable harm to his reputation, economic loss, humiliation, sense of outrage and indignity.

## COUNT VII: ASSAULT AND BATTERY
*(Against All Individual Defendants)*

303. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

304. At all times relevant hereto, Plaintiff was lawfully walking and/or standing on the sidewalk at the intersection of Wyandotte and Hudson in the City of Royal Oak.

305. At that time and place, Defendants' conduct manifested an unlawful threat to do bodily harm to Plaintiff.

306. Defendants' conduct was unlawful, unprivileged, and without probable cause or reasonable suspicion that Plaintiff was armed or dangerous.

307. The conduct of Defendants created a threat to Plaintiff under circumstances that created in him a well-founded fear of imminent peril.

308. Defendants had the apparent ability to carry out the threatened act if not prevented.

309. Under information and belief, Defendants were trained by the City of Royal to grasp a suspect's arms on pressure points in certain instances.

310. In the cases of the initial pat down search by Officer Mike and Heppner, for Plaintiff's wallet, as well as the second "frisk" by Officer Mike, the acts were not prevented, and Defendants willfully and intentionally struck Plaintiff's person against his will.

311. Officer Mike and Heppner also grabbed Plaintiff's arms on pressure points to create a fear in Plaintiff, in accordance with the City of Royal Oak's policy. This act was also not prevented, and Defendants again willfully and intentionally struck Plaintiff's person against his will.

312. As a direct and foreseeable consequence of these actions, Plaintiff has suffered loss of privacy, loss of property, loss of liberty, irreparable harm to his reputation, economic loss, humiliation, sense of outrage and indignity.

## COUNT VIII: COMMON LAW TRESPASS
*(Against All Individual Defendants)*

313. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

314. "At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo*, *supra*, at 34, 121 S. Ct. 2038, 150 L. Ed. 2d 94. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates." *United States v. Jones*, 565 U.S. 400, 406, 132 S. Ct. 945, 950 (2012).

315. Defendants O'Donohue, Klinge, Officer Mike, and Heppner, in a manner as described herein, created and executed a plan to physically intrude on a constitutionally protected area (namely, Plaintiff's person, papers, and effects) in order to obtain information.

316. Such an intrusion not only violates the Fourth Amendment, but also constitutes a common law trespass. *Id*. at 407.

317. As a direct and foreseeable consequence of these actions, Plaintiff has suffered loss of privacy, loss of property, loss of liberty,

irreparable harm to his reputation, economic loss, humiliation, sense of outrage and indignity.

## EXEMPLAMARY DAMAGES
*(As to All Defendants)*

318. Plaintiff repeats and re-alleges the allegations of the prior paragraphs as though fully set forth herein.

319. Defendants acted maliciously, with bad faith and ill will in their conduct herein mentioned, specifically by creating and executing a policy that disregarded all relevant constitutional law in the area of "stop and frisk" and "community caretaking", by violating MCL 764.15, by failing to correct the illegal practices after Plaintiff brought it to their intention, by endorsing the illegal conduct, and by making false claims to Plaintiff that such conduct was in accord with constitutional standards.

320. Plaintiff incurred incremental and increased injury to his feelings attributable to his sense of indignation and outrage.

321. Such incremental or increased injury to feelings was caused by Defendants' malicious acts, bad faith and ill will.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for an order and judgment:

A. Declaring the conduct of Defendants to be in violation of Plaintiff's constitutional rights;

B. Issuing an order for the following injunctive relief:

    a. enjoining the ROPD from continuing its policy, practice and/or custom of suspicionless stop and frisks and/or "community caretaking" stops;

    b. requiring the City of Royal and Chief O'Donohue to institute and implement improved policies and programs with respect to training, discipline, and promotion designed to eliminate the ROPD's policy, practice and/or custom of suspicionless stop and frisks and/or "community caretaking" stops;

    c. requiring the City of Royal Oak and Chief O'Donohue to deploy ROPD officers with appropriate and adequate supervision;

    d. requiring the City of Royal Oak and Chief O'Donohue to institute and implement appropriate measures to ensure compliance with departmental directives that ROPD officers complete documentation on each and every stop and frisk and/or "community caretaking" stop they conduct;

    e. requiring the City of Royal Oak and Chief O'Donohue to institute and implement appropriate measures to mandate that documentation be prepared and maintained in an up to date computerized database for each stop conducted by an officer, regardless of whether the stop is followed by the use of force, frisk, a search, or an arrest; and

    f. requiring the City of Royal Oak and Chief O'Donohue to monitor the stop and frisk and "community caretaking" practice of the ROPD, including periodically and regularly reviewing the new documentation related to the ROPD's stop and frisk

and/or "community caretaking" practices to determine whether reported stops have comported with constitutional requirements.

C. Awarding Plaintiff damages for Defendants' unconstitutional conduct that resulted in Plaintiff's loss of privacy, loss of property, loss of liberty, irreparable harm to his reputation, and economic loss;

D. Awarding Plaintiff exemplary damages for his humiliation, sense of outrage and indignity;

E. Awarding Plaintiff punitive damages;

F. Awarding Plaintiff attorney's fees, costs, and expenses of this litigation; and

G. Awarding Plaintiff all other relief that this Court deems just and proper.

Respectfully Submitted,

/s/ Joseph B. Gale_____
Joseph B. Gale (P79049)
Michigan Litigation Law
2020 Hazel St.
Birmingham, MI 48009
P: 248-850-5824
F: 248-856-0573
joey@michiganlitigationlaw.com

Dated: July 5, 2017

## <u>VERIFICATION</u>

STATE OF MICHIGAN        )
                         )
COUNTY OF OAKLAND        )


      Joseph Gale, being duly sworn, says: I am the Plaintiff in the above captioned lawsuit. I have read the above Verified Complaint and know the contents of the document to be true of my own knowledge, except those matters stated to be on information and belief, which I believe to be true.


_____
Joseph Gale