# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

---

**JOSEPH GALE**, an individual,

on behalf of himself and others
similarly situated,

      Plaintiff,

v.

    Case No.: 17-12172
    Hon.: Sean F. Cox

**CITY OF ROYAL OAK POLICE
CHIEF CORRIGAN O'DONOHUE**,
in his individual and official capacity,
**PHILLIP KLINGE**,
**MICHAEL PARAMO**, and
**NATHAN HEPPNER**,
in their individual capacities, jointly and
severally,

      Defendants.

---

| | |
|---|---|
| Joseph B. Gale (P79049) | Michael Rosati (P34236) |
| Plaintiff/Attorney for Class | Attorney for Defendants |
| Michigan Litigation Law | Johnson, Rosati, Schultz & Joppich |
| 2020 Hazel St. | 27555 Executive Drive, Suite 250 |
| Birmingham, MI 48009 | Farmington Hills, MI 48331-3550 |
| P: 248-850-5824 | P: 248-489-4100 |
| F: 248-856-0573 | F: 248-489-1726 |
| joey@michiganlitigationlaw.com | mrosati@jrsjlaw.com |

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Joseph Gale, brings this Motion pursuant to Fed. R. Civ. P. 56, and relies upon the attached Brief in Support, and Exhibits.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant his Motion for Summary Judgment with regard to the following claims in Plaintiff's Amended Complaint: Count I: Search and Seizure of Person in Violation of 42 U.S.C. § 1983, Count II: Seizure of Wallet/Deprivation of Property in Violation of Fourth Amendment and 42 U.S.C. § 1983 against all individual defendants; and the claim against City of Royal Oak Police Chief Corrigan O'Donohue ("O'Donohue"), in his official capacity, with regard to Count IV: *Monell* Liability Under 42 U.S.C. § 1983, and enter judgment in favor of Plaintiff.

Pursuant to Local Rule 7.1(a), the undersigned attempted to explain the nature of the motion and its legal basis, as well as request concurrence in this motion, but the undersigned was unable to obtain concurrence.

Respectfully Submitted,

/s/ Joseph B. Gale
Joseph B. Gale (P79049)
Michigan Litigation Law
2020 Hazel St.
Birmingham, MI 48009
P: 248-850-5824
F: 248-856-0573
joey@michiganlitigationlaw.com

Dated: December 4, 2018

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

---

**JOSEPH GALE**, an individual,

on behalf of himself and others
similarly situated,

       Plaintiff,

v.

Case No.: 17-12172
Hon.: Sean F. Cox

**CITY OF ROYAL OAK POLICE
CHIEF CORRIGAN O'DONOHUE**,
in his individual and official capacity,
**PHILLIP KLINGE**,
**MICHAEL PARAMO**, and
**NATHAN HEPPNER**,
in their individual capacities, jointly and
severally,

       Defendants.

---

| | |
|---|---|
| Joseph B. Gale (P79049) | Michael Rosati (P34236) |
| Plaintiff/Attorney for Class | Attorney for Defendants |
| Michigan Litigation Law | Johnson, Rosati, Schultz & Joppich |
| 2020 Hazel St. | 27555 Executive Drive, Suite 250 |
| Birmingham, MI 48009 | Farmington Hills, MI 48331-3550 |
| P: 248-850-5824 | P: 248-489-4100 |
| F: 248-856-0573 | F: 248-489-1726 |
| joey@michiganlitigationlaw.com | mrosati@jrsjlaw.com |

---

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1. On September 4, 2016 an apparent resident in the City of Royal Oak called 911 and when asked by the 911 operator what the emergency was, indicated that it was "not an emergency." (Ex. D to Def.'s Brief in Opp. (Dkt. 18) 911 call).

2. The caller(s) never identified themselves by name. (Ex. D to Def.'s Brief in Opp. (Dkt. 18) 911 call).

3. The following was reported by dispatch in response to the call: "MAN KNOCKED ON DOOR…HUSBAND ANSWERED . . . W/M … 5'10 .. THIN … 25YEARS…JEANS/SHIRT….LS W ON FOOT DONDERO..5 MINS AGO…TOLD THE HOMEOWNER HE WANTED TO HELP HIM AND HOME OWNER SAID I DON'T NEED HELP AND CLOSED DOOR." (Ex. B. to Pl.'s Am. Comp. CFS Narrative).

4. Every single Defendant from O'Donohue down essentially stated that their understanding of the legal justification for the underlying stop was the "investigation of possible ongoing activity by a suspicious person in the neighborhood as he matched the description of an individual who had engaged conduct [*sic*] earlier which resulted in a call to 911." (Def. O'Donohue's Resp. to Int. No. 5); (Def. Paramo's Resp. to Int. No. 9); (Def. Heppner's Resp. to Int. No. 3); (Def. Klinge's Resp. to Int. No. 3).

5. Defendant Klinge was the first officer to arrive on the scene, approximately ten (10) minutes after the dispatch report. (Ex. A to Def.'s Brief in Opp. (Dkt. 18) Klinge In-Car Video).

6. After witnessing Plaintiff walking in a straight line down a sidewalk heading North on Wyandotte, Klinge made a show of authority intended to order Plaintiff to stop walking based solely on the information received on the 911 call. (Def. Klinge's Resp. to Req. to Admit No. 1, 6 and 9).

7. Klinge would not have allowed Plaintiff to continue walking down the sidewalk, unless Plaintiff stopped and talked to him. (Def. Klinge's Resp. to Req. to Admit No. 9 and 16).

8. Plaintiff did in fact yield to the show of authority made by Klinge. (Ex. A to Def.'s Brief in Opp. (Dkt. 18) Klinge In-Car Video).

9. After being detained by Klinge, Heppner and Paramo approached Plaintiff from both sides, with Paramo approaching from behind. (Ex. A to Def.'s Brief in Opp. (Dkt. 18) Klinge In-Car Video).

10. Defendant Paramo silently approached Plaintiff and grabbed his arm before announcing his presence in accordance with Royal Oak policy, practice, or custom. (Def. Paramo's Dep. Tr. at 159).

11. Heppner patted down Plaintiff's right side and grabbed Plaintiff's right arm in the "elbow area" without Plaintiff's consent. (Def. Heppner's Dep. Tr. at 43 and 45).

12. Defendant Paramo patted down Plaintiff's left side around Plaintiff's hip and belt area, and his front and rear pocket, and grabbed Plaintiff's left arm without Plaintiff's consent and kept ahold of Plaintiff's arm until he had secured Plaintiff's wallet. (Def. Paramo's Dep. Tr. at 141-42 and 146-47).

13. The officers grabbed Plaintiff's arm without consent, in unison, and patted Plaintiff down in accordance with Royal Oak policy, practice, or custom. (Def. Paramo's Dep. Tr. at 149-50).

14. The officers appreciated that Plaintiff kept his hands in the air during the pendency of the frisk and thereafter. (Def. Paramo's Dep. Tr. at 154).

15. Despite the video evidence showing Paramo stating that Plaintiff was free to leave before Plaintiff was placed in the back of Paramo's police cruiser, Defendant Paramo confirmed under oath that Plaintiff was not free to walk on his own. (Def Paramo's Dep Tr. at 61-63).

16. O'Donohue has final policy making authority for the Royal Oak Police Department. (Def. O'Donohue's Dep. Tr. at 9).

17. The officers' actions in this case, in responding to the underlying call for service, were all in accordance with established department procedures. (Def. O'Donohue's Dep. Tr. at 109-10).

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---

**JOSEPH GALE**, an individual,

on behalf of himself and others
similarly situated,

      Plaintiff,

v.

                                               Case No.: 17-12172
                                               Hon.: Sean F. Cox

**CITY OF ROYAL OAK POLICE
CHIEF CORRIGAN O'DONOHUE**,
in his individual and official capacity,
**PHILLIP KLINGE**,
**MICHAEL PARAMO**, and
**NATHAN HEPPNER**,
in their individual capacities, jointly and
severally,

      Defendants.

---

| | |
|---|---|
| Joseph B. Gale (P79049) | Michael Rosati (P34236) |
| Plaintiff/Attorney for Class | Attorney for Defendants |
| Michigan Litigation Law | Johnson, Rosati, Schultz & Joppich |
| 2020 Hazel St. | 27555 Executive Drive, Suite 250 |
| Birmingham, MI 48009 | Farmington Hills, MI 48331-3550 |
| P: 248-850-5824 | P: 248-489-4100 |
| F: 248-856-0573 | F: 248-489-1726 |
| joey@michiganlitigationlaw.com | mrosati@jrsjlaw.com |

## **PLAINTIFF'S BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

## <u>STATEMENT OF ISSUES</u>

1.  Whether Plaintiff was unconstitutionally stopped and frisked?

Plaintiff answers: Yes

2.  Whether Plaintiff was unconstitutionally stopped and frisked pursuant to a

    policy, custom or practice of the Royal Oak Police Department?

Plaintiff answers: Yes

## <u>STATEMENT OF MOST CONTROLLING AUTHORITY</u>

**Cases**

*Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000)

*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)

*United States v. Johnson*, 620 F.3d 685 (6th Cir. 2010)

*Feathers v. Aey,* 319 F.3d 843 (6th Cir. 2003)

# **TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………...…..1

STANDARD OF REVIEW………………………………………………………...2

ARGUMENT……………………………………………………………………2

   A. Count I: Search and Seizure of Person in Violation of 42 U.S.C. § 1983…..3

      a.  When was Plaintiff Seized?...................................................................3

      b.  There is No Doubt that the Underlying Stop Was Unconstitutional Under Clearly Established Law and Defendants are Not Entitled to Qualified Immunity…..…………….…………………….…….…..…6

      c.  A Reported Knock on a Door Does not Allege a Violation of Any Royal Oak Ordinance……………………………………………..15

      d.  Any Alleged Consent After Plaintiff was Seized Was Tainted by the Underlying Illegal Stop…………………………………………...16

      e.  Police Chief O'Donohue Individual Liability………………………..17

   B. Count IV: *Monell* Liability Under 42 U.S.C. § 1983………………………19

CONCLUSION……………………………………………………………...23

CERTIFICATE OF SERVICE…………………………………………………25

# INDEX OF AUTHORITIES

*Alabama v. White,*
 496 U.S. 325, 110 S. Ct. 2412, 2416, 110 L. Ed. 2d 301 (1990)……………6

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)………………………………………...……………..2

*Bennett v. City of Eastpointe*,
 410 F. 3d 810 (6th Cir. 2005)………………………………………………4

*Brower v. County of Inyo*,
 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)……………………3

*California v. Hadari D.*,
 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed. 690 (1991)………………………3

*Feathers v. Aey,*
 319 F.3d 843 (6th Cir. 2003)………………………………………...10-13

*Hays v. Jefferson County, Ky.*,
 668 F. 2d 869 (6th Cir. 1982)………………………………………………17

*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*,
 542 US 177 (2004)………………………………………………………..2

*People v. Dunbar*,
 690 N.W.2d 476 (Mich. App. 2004)………………………………………..5

*People v. Facreau*,
 255 Mich. App. 32, 661 N.W.2d 584 (Mich. App. 2003)…………………15

*People v. MacLeod*,
 254 Mich. App. 222, 656 NW 2d 844 (Mich. App. 2002)…………...…15-16

*People v. Walker*,
 130 Mich. App. 304 (Mich. App. 1983)……………………………………5

*Shehee v. Luttrell*,
 199 F.3d 295 (6th Cir. 1999)…………………………………….…17

*Skousen v. Brighton High Sch.*,
　　305 F.3d 520 (6th Cir. 2002)………………………………….…………..2

*Terry v. Ohio*,
　　392 U.S. 1 (1968)………………………………………………………2

*United Pentecostal Church v. 59th District Judge*,
　　51 Mich. App. 323, 214 N.W.2d 866 (Mich. App. 1974)………………..15

*United States v. Beauchamp*,
　　659 F.3d 560 (6th Cir. 2011)………………………………………….16

*United States v. Caruthers*,
　　458 F.3d 459 (2006)……………………………………………….13-14

*United States v. Cohen,*
　　481 F.3d 896 (6th Cir. 2007)…………………………………………...6

*US v. Figueredo-Diaz,*
　　718 F. 3d 568718 F.3d 568 (6th Cir. 2013)…………………….…………2

*United States v. Johnson*,
　　620 F.3d 685 (6th Cir. 2010)………………………………………...7-9

*United States v. Johnson*,
　　170 F.3d 708 (7th Cir. 1999)………………………………………...1

*United States v. Roberson*,
　　90 F.3d 75 (3rd Cir. 1996)……………………………………....…14-15

*United States v. Ward*,
　　961 F.2d 1526 (10th Cir. 1992)…………………………………………...4

## INTRODUCTION

"When the people of the United States decided to include the Fourth Amendment in the Bill of Rights, they did so for a reason." *United States v. Johnson*, 170 F.3d 708, 710 (7th Cir. 1999). "They wanted to place constraints on the power of the police to conduct searches and seizures . . . because they knew that such unchecked power could lead to serious abuses." *Id.* (*citing Payton v. New York*, 445 U.S. 573, 583, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

In the case at bar, numerous officers in the Royal Oak Police Department ("ROPD") harassed a law-abiding citizen, based upon an inchoate and unparticularized suspicion or hunch, in the hopes of uncovering some previously unknown illegality. All of the officers did so in accordance with ROPD policy, practice, or custom.

As there is no genuine of fact that the officers' conduct and the policy, practice, or custom that the officers acted in accordance with violated the Constitution, this Court should grant Plaintiff's Motion for Summary Judgment with respect to the following claims against all of the individual defendants: Count I: Search and Seizure of Person in Violation of 42 U.S.C. § 1983, Count II: Seizure of Wallet/Deprivation of Property in Violation of Fourth Amendment and 42 U.S.C. § 1983; and the claim against City of Royal Oak Police Chief Corrigan O'Donohue

("O'Donohue"), in his official capacity, with regard to Count IV: *Monell* Liability

Under 42 U.S.C. § 1983.

## STANDARD OF REVIEW

Summary judgment will be granted when no genuine issue of material fact

exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue

of material fact exists where "the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Id*. The Court "must view the evidence, all facts,

and any inferences that may be drawn from the facts in the light most favorable to

the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir.

2002).

## ARGUMENT

### A. Count I: Search and Seizure of Person in Violation of 42 U.S.C. § 1983

An investigatory stop must be "justified at its inception." *Hiibel v. Sixth*

*Judicial Dist. Court of Nev., Humboldt Cty.*, 542 US 177, 187 (2004); *United States*

*v. Sharpe*, 470 U. S. 675, 682 (1985); *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Thus,

"[r]easonable suspicion for a stop cannot logically be based on events that occur

after the suspect is seized." *US v. Figueredo-Diaz*, 718 F. 3d 568718 F.3d 568, n. 2

(6th Cir. 2013) (*citing United States v. Johnson*, 620 F.3d 685, 696 (6th Cir. 2010)

("reasonable suspicion for a stop cannot be based on events that occur after the

defendant is seized, the district court erred in considering these actions." Johnson at

696). As such, anything that occurred after Plaintiff was seized, cannot be used to justify the reasonable suspicion in this case.

### a. When was Plaintiff Seized?

A seizure occurs when there is either (a) "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful," or (b) submission to "a show of authority." *California v. Hadari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed. 690 (1991); *see also Bennett v. City of Eastpointe*, 410 F. 3d 810, 834 (6th Cir. 2005). Put another way, when a seizure is effected by even "the slightest application of physical force," it is immaterial whether the suspect yields to that force. *Id*. at 625-26. In contrast, if a suspect in the absence of physical force does not submit to an officer's show of authority, there is no seizure and no Fourth Amendment claim. *Id*. at 626-27. The question is "whether the officer's words and actions would have conveyed [] to a reasonable person" an order "to restrict his movement." *Id*. at 628. **<u>"Whenever an officer restrains the freedom of a person to walk away, he has seized that person."</u>** *Brower v. County of Inyo*, 489 U.S. 593, 595, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).

The analysis in this case is extremely easy, as there is no dispute as to when Plaintiff was seized: Plaintiff was seized while walking down the sidewalk, before he stopped. Defendant Phillip Klinge ("Klinge") admitted that he intended to "restrain" the freedom of Plaintiff to continue walking down the sidewalk and that

he would not have allowed Plaintiff to continue walking down the sidewalk, unless Plaintiff stopped and talked to him. Exhibit A, Def. Klinge's Resp. to Req. to Admit No. 9 and 16). Moreover, there is no doubt that Plaintiff did in fact yield to the show of authority made by Klinge. (Ex. A to Def.'s Brief in Opp. (Dkt. 18) Klinge In-Car Video).

Moreover, even without these admissions, it would have been clear to any reasonable person that they were not free to leave upon Klinge's initial contact with Plaintiff. *See United States v. Ward*, 961 F.2d 1526, 1532-33 (10th Cir. 1992) (finding that a "person who is alone when approached by law enforcement officers is more likely to feel that he or she was the specific object of the officers' inquiry" and therefore less likely to feel free to terminate the encounter.); *see also Florida v. Bostick*, 501 U.S. 429, 423, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (finding it significant that officers told the defendant that he could refuse consent).

> i.   *Show of Authority*

The activation of the overhead lights was a clear signal to stop, and a clear show of authority, coupled with Klinge's quick exit from the vehicle, and Plaintiff's submission to the show of authority, created a seizure. (Ex. A to Def.'s Brief in Opp. (Dkt. 18) Klinge In-Car Video). *See Bennett v. City of Eastpointe*, 410 F. 3d 810, 834 (6th Cir. 2005) (finding that when an officer "activated his siren—a show of

authority—and Bush and his friends stopped riding their bikes and gave attention—submission to Magrita's show of authority" a seizure occurred).

Additionally, if there was any dispute remaining as to when Plaintiff was seized, he was certainly seized upon being ordered to remove his hands from his pockets. *See People v. Dunbar*, 690 N.W.2d 476, 482 (Mich. App. 2004) (by ordering the individual to "remove his hands from his coat, [the officer] engaged in conduct that would communicate to a reasonable person that he or she was not free to ignore the police presence."); *see also People v. Walker*, 130 Mich. App. 304, n. 2 (Mich. App. 1983) ("In the present case, the police officers did more than just approach a citizen and ask a question. They showed their badges. They also asked defendant to take his hands out of his pockets. The police need at least a reasonable suspicion to justify this intrusion." (internal citations omitted)); *see also Jones v. State*, 745 A.2d 856 (Del. 1999) (finding that when an officer made "initial contact with defendant [and] identified himself and, for the officers' safety before questioning, asked defendant to remove his hands from his coat pockets . . . the facts indicate that defendant was detained pursuant to an investigatory stop.")

As such, anything that occurred after Plaintiff stopped walking down the sidewalk and submitted to Klinge's show of authority cannot be used to justify any of the officers' purported reasonable suspicion. Therefore, the only issue for this court to decide is whether the 911 call alone created reasonable to stop an individual

seen walking in a straight line down a sidewalk fifteen (15) minutes after an individual was reported to have knocked on a door and then walked away.

### b. There is No Doubt that the Underlying Stop Was Unconstitutional Under Clearly Established Law and Defendants are Not Entitled to Qualified Immunity

It is not enough to have "an inchoate and unparticularized suspicion or hunch," but "the level of suspicion required for a *Terry* stop is obviously less demanding than for probable cause." *Alabama v. White,* 496 U.S. 325, 329-30, 110 S. Ct. 2412, 2416, 110 L. Ed. 2d 301 (1990) (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989)). In *United States v. Cohen,* 481 F.3d 896 (6th Cir. 2007), the Sixth Circuit explained that a 911 report that "there might be an emergency, which might or might not include criminal activity," amounts to simply a possible suggestion of "a limited assertion of illegality" and would be unreliable absent some corroboration of criminal activity by the responding officers. [1]

As explained more thoroughly in the cases below, the officers in the present case plainly violated Plaintiff's clearly established constitutional rights by stopping Plaintiff in response to a "non-emergency" 911 call reporting that an individual knocked on a door and then walked away.

---

[1] Plaintiff incorporates by reference his thorough explanation of the law regarding investigatory stops stated in his Motion for a Preliminary Injunction (Dkt. 12).

i. *United States v. Johnson*

In *United States v. Johnson*, 620 F.3d 685 (6th Cir. 2010) a local resident in an apartment complex called 911 concerned that "some people [came] by [her] house and they're back." *Id*. at 688. The 911 caller reported that the individuals were presently walking around her house. *Id*. The 911 caller further reported that the individuals were connected with a blue Cadillac. *Id*. Two officers responded "within two to three minutes" after they "were told by the dispatcher that the caller reported suspicious people around a blue Cadillac." *Id*. The officers had also "responded to calls from the same caller earlier that evening and the previous day." *Id*. The officers parked their vehicles behind the blue Cadillac and "alighted from their vehicles, scanned the area, and saw a person who turned out to be Johnson walking from a grassy area to the side of the [911 caller's residence]." *Id*. at 689. The "officers did not observe anyone else walking or running in the area." *Id*. Johnson was "carrying a bag, a fact that Lamb testified made him suspicious." *Id*. The officers ordered Johnson to stop and put his hands up numerous times and Johnson ignored the orders. *Id*. Eventually the officers drew their weapons and ordered Johnson to stop and he complied. *Id*. Johnson challenged that "the officers lacked a constitutional basis to detain him." *Id*. at 690.

The Sixth Circuit explained the "totality of the circumstances consisted of the following facts when Johnson submitted to the officers' orders to stop:"

7

(1) Johnson was in a high drug-trafficking area; (2) it was 4:00 a.m.; (3) the officers were responding to a 911 call; (4) two or three minutes after the 911 call, the officers observed Johnson twenty to thirty yards from the blue Cadillac referenced in the call and near the residence from which the call was made; (5) the officers did not notice anyone else in the area, besides the driver of the white car to which Johnson was headed; (6) Johnson did not stop when called to by the officers and instead continued walking toward the white car; and (7) he was carrying a bag, which he threw into the white car.

*Id*. at 692. The Sixth Circuit ultimately held that "these circumstances were insufficient to allow an officer reasonably to suspect Johnson of criminal activity." *Id*.

The court found Johnson's "presence in a high-crime location and the lateness of the hour" unpersuasive in the reasonable suspicion analysis because although "the area was known for drug trafficking specifically, [the officers] observed no conduct from Johnson consistent with drug activity." *Id*. The court reasoned that "the third, fourth, and fifth facts" also unpersuasive in the reasonable suspicion analysis because "the 911 call "was too vague and `provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility,' and it lacked even `moderate indicia of reliability.'" *Id*. The court opined that even if Johnson was one of the people reported by the 911 caller, ***the call did not allege any criminal activity*** and therefore the stop was unconstitutional. *Id*. The court reasoned "<u>to the extent that the caller suggested a limited, unspecified possibility of criminal activity, her tip could not be considered reliable unless the</u>

officers' own observations raised the prospect of criminal activity." *Id*. at 693-94. Thus, the court concluded that the fact that "Johnson was near the caller's home and the blue Cadillac when the police arrived deserves "little weight in the reasonable-suspicion calculus." *Id*.

The *Johnson* court ultimately held that since the 911 call "at most suggested that someone was doing something suspicious in the area" and when the officers arrived on the scene "Johnson did not flee or otherwise react suspiciously to the officers' presence, but rather continued along the precise trajectory he was following when the officers arrived" the officers alleged reasonable suspicion "**fall[s] far short** of the constitutional standard." (emphasis added) *Id*. at 696.

It is rather remarkable that the officers in this case, from O'Donohue down, stated that the legal justification for the underlying stop in the present case was exactly what the *Johnson* court found to be unconstitutional. Every single defendant essentially stated that their understanding of the legal justification for the underlying stop was the "investigation of possible ongoing activity by a suspicious person in the neighborhood as he matched the description of an individual who had engaged conduct [sic] earlier which resulted in a call to 911." Exhibit B, O'Donohue's Written Interogatory Response to No. 5.

ii.    *Feathers v. Aey*

This is the same reasoning that was applied in *Feathers v. Aey,* 319 F.3d 843 (6th Cir. 2003) a case in which "at approximately 1:25 in the morning" a local resident called 911 to "[report] that moments earlier, a white male with a beard on a porch on North Howard Street had pointed something at the caller and told the caller to shut up." *Id*. at 846. The caller said that the individual "looks like he is pretty drunk," and said that although he didn't know the address from which the individual had spoken, the house was two houses from the corner." *Id*. at 846. The caller did not "identify himself by name but suggested that 'you can have somebody come by here.'" *Id*. The dispatcher then instructed a patrol car near the area to approach 708 North Howard Street and reported that a "Signal 9 is on the porch near the corner, it's a white male with a beard, no shirt, possible 4, he pointed something at a caller, so he possibly has a weapon." *Id*. The court clarified that "a signal 9 is a suspicious person." *Id*. at n. 1. The dispatcher incorrectly reported that the "suspicious person" had a weapon.

Two officers responded to the dispatch and saw on a nearby porch an individual who they believed matched the dispatcher's description. *Id*. The officers approached the man and ordered him "to take his hands out of his pockets." *Id*. The man refused the officers' repeated instructions to remove his hands. *Id*. The man then turned his back to the officers, "went back toward the door that led into his

house" and leaned into the house. *Id*. At that point the officers ran onto the porch and physically seized the man. *Id*. The officers reported that they "could smell alcohol on Feathers' breath" and ultimately arrested him. *Id*. at 847. Feathers' then filed suit under § 1983 alleging "that the officers' initial *Terry* stop violated his Fourth Amendment rights." *Id*. at 848.

The officers argued that the stop was proper because "[b]ased on the dispatcher's description over the police radio of a suspicious person, the officers knew that on North Howard Street, a bearded, shirtless white male who possibly was intoxicated and possibly had a weapon had pointed something at a caller." *Id*. at 849. However, the Sixth Circuit found that the 911 call did not provide reasonable suspicion because the call "did not even allege *any* criminal activity." (emphasis in original) *Id*. at 850.

The court explained that the officers could develop proper reasonable suspicion "if their observations, when combined with the information provided to the dispatcher, supported a finding of reasonable suspicion." *Id*. Although, the officers argued that they had corroborated the information from the 911 call by "finding a shirtless white male on North Howard Street" and therefore "they were able to form a reasonable suspicion that justified a Terry stop," the Sixth Circuit disagreed. *Id*. The court explained that "the only information that they corroborated is precisely the information that the Supreme Court ruled fails to support reasonable

suspicion." *Id*. The court explained that Feathers' identity consisted of "easily obtained facts and conditions existing at the time of the tip, [not] future actions of third parties ordinarily not easily predicted." *Id*. (*quoting* Alabama v. White, 496 U.S. at 332, 110 S.Ct. 2412.)

Significantly for the case at bar, the Sixth Circuit, even back in 2003, also held that "the rights at issue here were clearly established when the incident occurred." *Id*. The court explained that "*Terry*, which requires reasonable suspicion for investigative detentions, had been clearly established since 1968." *Id*. Additionally, the "Supreme Court had emphasized the importance of establishing the reliability of anonymous tips in 1990 in *White* and had re-affirmed that principle in *J.L.*" *Id*. And lastly, "an officer may rely on a dispatch for reasonable suspicion only to the extent that the dispatch is itself based on sufficient information had been established since Hensley in 1985." *Id*.[2]

However, the court ultimately found the officers entitled to qualified immunity because "[i]f the dispatcher's information were accurate and reliable . . . the totality of circumstances would justify the Terry stop." *Id*. at 851. That is, if

---

[2] *See also Jacobs v. Village of Ottawa Hills*, 5 Fed. Appx. 380 (6th Cir. 2001) (unpublished) (denying qualified immunity, in an action alleging false arrest, to officer that conducted *Terry* stop after the officer received a dispatch reporting a "lost or confused" person on a specific corner and the individual responded to the officer in a defensive and hostile manner and walked away when asked for identification).

someone called 911 and reported that an individual was reported to have committed a serious felony offense like being intoxicated and pointing a weapon at the caller, the officers would have been justified in stopping the suspected individual.

In the present case, the dispatch report did not mistakenly report a serious felony offense like in *Feathers*, and thus, even if relying upon the dispatch, the officers were not justified in stopping Plaintiff. As such, the officers' conduct violated clearly established law and the officers are not entitled to qualified immunity.

### iii.    United States v. Caruthers

Again, in *United States v. Caruthers*, 458 F.3d 459 (2006) an individual made an emergency call to the police at approximately 1:15 A.M which resulted in the following dispatch report: "Male black. . . . Red shirt, shorts, fired gun in the air, arguing with female at location, gun is in the suspect's pocket, fired the weapon once. . ." *Id*. at 462. The officers "arrived on the scene about three to five minutes later." *Id*. The officers "observed a black man wearing a red shirt (later identified as Caruthers) entering the parking lot of a nearby gas station . . . Nobody else was in the area." *Id*. "The entire encounter — from when Officer Stocks first saw Caruthers to when [the officers arrested him] — lasted three or four minutes." *Id*. at 463. On the appeal, **the Sixth Circuit found that "there is no doubt that the stop of Caruthers would have been impermissible if it had been justified solely" by the**

13

**emergency call.** *Id*. at 465. The Court explained that the "Court's insistence on additional detail from the tipster and corroborating observation by the police helps ensure that police do not use vague tips to violate the Fourth Amendment rights of innocent citizens." *Id*. at 466.

      iv.    *United States v. Roberson*

A look to other circuits also supports the illegality of the stop. The Third Circuit faced the issue of whether a 911 call "indicating that a heavy-set, black man wearing green pants, a brown leather jacket, and a white hooded sweatshirt was selling drugs on the 2100 block of Chelten Avenue – together with the subsequent observations by officers . . . provided reasonable suspicion . . . for an investigative stop." *United States v. Roberson*, 90 F.3d 75, 79 (3rd Cir. 1996)[3]. The court found that the descriptive information from by the 911 call was not persuasive because "the caller could have been looking out his window at a heavy-set black man in green pants, brown leather jacket, and white hooded sweat shirt at the time of the 911 call." *Id*. The court opined that the 911 call at issue provided no predicted future actions of the suspected individuals, and therefore "an information basis for forming reasonable suspicion was absent." *Id*. at 80. Thus, the court held that "[i]n the absence of any observations of suspicious conduct or the corroboration of

---

[3] This case was cited with approval in a published opinion by the Sixth Circuit in *United States v. Patterson*, 340 F.3d 368, (6th Cir. 2003).

information from which the police could reasonably conclude that the [911 caller's] allegation of criminal activity was reliable, we must conclude there was no reasonable suspicion." *Id*. at 81.

### c. A Reported Knock on a Door Does not Allege a Violation of Any Royal Oak Ordinance

Assuming Defendants still rely upon their assertion that a knock on a door constitutes a "noise violation," this argument is entirely frivolous.

Over forty (40) years ago the Michigan court of appeals held that a city's penal antinoise ordinance was unconstitutionally vague where by its terms it prohibited, inter alia, "loud, unnecessary" or any noise which "annoys" comfort, repose, health, peace or safety of others within city limits. *United Pentecostal Church v. 59th District Judge*, 51 Mich. App. 323, 214 N.W.2d 866 (Mich. App. 1974). In accordance with this ruling, the ordinance cited by Defendants has a second requirement (in addition to "unreasonable noise") entirely ignored by Defendants: "that tends to cause a public danger, alarm, disorder or nuisance."

While Defendants cite absolutely no authority for their interpretation of the ordinance, Michigan case law that has addressed similar ordinances, illuminates the fallacy of Defendants' argument. *See People v. Facreau*, 255 Mich. App. 32, 661 N.W.2d 584 (Mich. App. 2003) (explaining the important distinction between the use of the term "public" rather than "private" in a disorderly conduct ordinance); *see also People v. MacLeod*, 254 Mich. App. 222, 226, 656 NW 2d 844, 848 (Mich.

15

App. 2002) (finding probable cause that a noise "disturb[ed] the public peace" because the officer "could hear defendant "as clear as day" from down the street . . . the constant screaming a block away."); *City of Lansing v. Hartsuff*, 213 Mich. App. 338, 347, 539 NW 2d 781, 790 (Mich. App. 1995) (finding a noise "disturbed the public peace" when it was "sufficiently loud to be heard across the street.")

There are no facts in this case to explain why the underlying alleged knock in this case differed from a usual knock, in that it could be heard by anyone other than the *private* residence where the knock occurred. As such, just like in *Johnson* and *Feathers* above, Defendants were not investigating any crime at all.

### d. Any Alleged Consent After Plaintiff was Seized Was Tainted by the Underlying Illegal Stop

In *United States v. Beauchamp*, 659 F.3d 560, 573 (6th Cir. 2011), the Sixth Circuit noted that where a defendant has voluntarily consented after an illegal seizure, "the consent is tainted by the illegality and does not justify the search." *Id*. The Sixth Circuit noted that it has "repeatedly followed this precedent." *Id*. (*quoting United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003).

As a result, since the underlying stop was unconstitutional, Plaintiff could not, as a matter of law, consent to being frisked and having his wallet seized by either Heppner or Paramo. As such, there is no genuine issue of fact with regard to Count I: Search and Seizure of Person in Violation of 42 U.S.C. § 1983 and Count II:

Seizure of Wallet/Deprivation of Property in Violation of Fourth Amendment and 42 U.S.C. § 1983.

### e.  Police Chief O'Donohue Individual Liability

It is clear that § 1983 liability must be based on more than *respondeat superior*, or the right to control employees. However, a supervisor or final policymaker, is liable if he or she "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999) (*citing Hays v. Jefferson County, Ky.,* 668 F.2d 869, 874 (6th Cir.1982)).

"It is essentially this same concept that requires that the implementation or execution of a governmental policy or custom be shown before liability can be imposed on a municipality." *Hays v. Jefferson County, Ky.*, 668 F. 2d 869, 872 (6th Cir. 1982). Where the constitutional violation was not alleged to be of a pattern of past misconduct, "a supervisory official or a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable, *e.g., Leite v. City of Providence,* 463 F.Supp. at 590, or would properly be

characterized as substantially certain to result, *Rheuark v. Shaw,* 477 F.Supp. 897 (N.D. Texas 1979)." *Id.* at 874.

Here, there is no dispute that O'Donohue has final policy making authority and that the underlying conduct was in accordance "established departmental procedures" that he created. *See* Exhibit C, O'Donohue Dep. at 9, "I have the final approval of a policy whether or not it's going to be accepted by the Royal Oak Police Department," and O'Donohue Dep. at 109-10 O'Donohue confirmed that the officers acted consistent with "established departmental procedures." Thus, there is no genuine issue of fact that the officers actions were consistent with established ROPD policy created by O'Donohue. And since the underlying stop was unconstitutional, Plaintiff established an unconstitutional policy.

Alternatively, O'Donohue's complete failure to make a policy in a situation that demands policy creates liability as well. "In situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998) (*quoting Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986)).

In the present case, O'Donohue testified at his deposition that the City of Royal Oak does not even have any investigatory stop policy at all. *See* O'Donohue Dep. at 16: "We do not have an investigatory stop policy." Moreover, the Royal Oak Police Department does not have *any* "training material" related to investigatory

stops. *See* O'Donohue Resp. to Req. to Prod. No. 6). This failure to have any policy at all, nor any training materials, amounts to a policy of deliberate indifference.

Lastly, Plaintiff clearly has alleged that there is a causal connection between O'Donohue's actions (creating the inadequate policy) and the constitutional violation (Klinge, Heppner, and Paramo violating his civil rights by conducting an unconstitutional investigatory stop and frisk).

## B. Count IV: *Monell* Liability Under 42 U.S.C. § 1983.

A municipality can only be liable under section 1983 when the municipality itself causes the violation. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989). "To establish municipal liability, the plaintiff must prove (1) the existence of a municipal policy or custom and (2) a direct causal link between the policy or custom and the alleged constitutional deprivation." *Lilly v. City of Clarksville*, 510 F. App'x. 374, 376 (6th Cir. 2013).

"To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015). A city employee with "final policymaking authority" who ratifies unconstitutional conduct by his subordinates is said to articulate official policy and

so open the municipality to liability." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010).

Here, the municipal liability is clear. There is no dispute that O'Donohue has final policy making authority. *See* Exhibit C, O'Donohue Dep. at 9, "I have the final approval of a policy whether or not it's going to be accepted by the Royal Oak Police Department," and O'Donohue Dep. at 109-10 O'Donohue confirmed that the officers acted consistent with "established departmental procedures."

As explained above in the context of O'Donohue's individual liability, for the same reasons, he is liable in his official capacity claim as well. However, Plaintiff will briefly address the inadequate training theory.

The Sixth Circuit has recognized two situations in which inadequate training could be found to be the result of deliberate indifference: (1) failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction, and (2) failure to act in response to repeated complaints of constitutional violations by its officers. *Cherrington v. Skeeter,* 344 F.3d 631, 646 (6th Cir. 2003). Specifically, Plaintiff alleges a failure to train in the following areas: (1) understanding the general meaning of "reasonable suspicion"; and (2) understanding how to develop reasonable suspicion in response to a call/dispatch report.

The failure to adequately train the officers is clear. O'Donohue testified at his deposition that the City of Royal Oak does not even have any investigatory stop policy at all. *See* O'Donohue Dep. at 16: "We do not have an investigatory stop policy." Moreover, the Royal Oak Police Department does not have *any* "training material" related to investigatory stops. *See* O'Donohue Resp. to Req. to Prod. No. 6).

In *Vineyard v. Cnty. of Murray, Ga.,* 990 F.2d 1207, 1212 (11th Cir. 1993), the plaintiff presented evidence that the County had "inadequate policies of supervision, discipline and training of [sheriff] deputies ... and that these policies demonstrated the deliberate indifference of the County to the rights of arrestees to be free from [constitutional violations at the hands of] the County's deputies." *Vineyard,* 990 F.2d at 1212. Although the plaintiff in the *Vineyard* case did not present evidence of prior similar incidents, he did present evidence that because of the County's decision to not have even the most basic policies in effect that police abuses were certain to occur. *Vineyard,* 990 F.2d at 1213.

Here, Plaintiff alleges that the City was deliberately indifferent to the rights of people who may come into contact with the City's police officers by failing to have adequate supervision policies, or any policies at all, in place with regard to investigatory stops and subsequent frisks. In other words, Plaintiff is complaining that the City's deficient policies directly led to the officers conducting an

investigatory stop of Plaintiff. This is directly analogous to the claims in *Vineyard,* where the plaintiff claimed that the county had "inadequate policies for training, supervision, and discipline."

Additionally, it was the highly predictable or plainly obvious consequence of the lack of a written policy regarding investigatory stops generally, let alone regarding the need of the officers to understand the reliability of dispatch reports and calls, and of not having *any* training materials regarding investigatory stops, that individuals' rights would be violated. Thus, the evidence in this case only allows for one conclusion: the City and O'Donohue consciously or deliberately chose to ignore a risk of harm which the City has been put on notice due to the high predictability that wrongful acts would occur. Thus, Plaintiff has conclusively established that the training was inadequate, the inadequacy was the result of deliberate indifference, and the inadequacy was closely related to or actually caused the injury.

## CONCLUSION

The Sixth Circuit has made clear that the law regarding investigatory stops has been clearly established. There is a plethora of caselaw establishing the illegality of the underlying investigatory stop in the present case. Moreover, O'Donohue confirmed that the officers acted in accordance with established departmental procedure.

As such, there is no genuine of fact that the officers violated Plaintiff's constitutional rights pursuant to the City of Royal Oak unconstitutional policy, custom or practice, and this Court should grant Plaintiff's Motion for Summary Judgment with respect to the following claims against all of the individual defendants: Count I: Search and Seizure of Person in Violation of 42 U.S.C. § 1983, Count II: Seizure of Wallet/Deprivation of Property in Violation of Fourth Amendment and 42 U.S.C. § 1983; and the claim against City of Royal Oak Police Chief Corrigan O'Donohue ("O'Donohue"), in his official capacity, with regard to Count IV: *Monell* Liability Under 42 U.S.C. § 1983, and enter judgment in favor of Plaintiff.

Respectfully Submitted,

/s/ Joseph B. Gale
Joseph B. Gale (P79049)
Michigan Litigation Law
2020 Hazel St.
Birmingham, MI 48009
P: 248-850-5824
F: 248-856-0573
joey@michiganlitigationlaw.com

Dated: December 4, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 4, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification to all registered participants.

/s/ Joseph Gale_____

Joseph Gale