UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Joseph Gale,

      Plaintiff,

v.                                                         Case No. 17-12172

Corrigan O'Donohue, *et al.*,                              Sean F. Cox
                                                           United States District Court Judge
      Defendants.

_____/

## **OPINION AND ORDER**

In the early morning of September 4, 2016, a resident of Royal Oak, Michigan called 911

to report "a strange man" who knocked on her door. Minutes later, the responding police officers

encountered Plaintiff Joseph Gale walking down an otherwise deserted street, roughly a quarter mile

away from the caller's house. Gale matched the description of the knocker, who the officers

suspected was "casing" houses for burglaries. The officers stopped Gale, performed a brief

patdown, and removed his wallet from his back pocket to check his ID. After a few minutes of

questioning, the officers determined that Gale was not the knocker, and offered him a ride to a more

familiar part of town. Gale accepted the ride and one of the officers performed a more thorough

frisk before putting him in the back seat of a patrol car. During the ride, Gale had second thoughts

and asked to leave the moving car. Roughly 90 seconds later, the officer dropped off Gale at a gas

station in downtown Royal Oak.

Gale, a lawyer, filed this action against the three officers at the scene and the Royal Oak

Chief of Police. Gale alleges claims for unconstitutional search and seizure, unconstitutional seizure

1

of his wallet, abuse of process, conspiracy to violate his civil rights, *Monell* liability against the City, false imprisonment, conspiracy to commit false imprisonment, assault and battery, common law trespass, and a violation of Michigan's Freedom of Information Act.

Both sides now move for summary judgment. For the reasons below, the Court will deny Gale's motion, grant summary judgment in favor of Defendants on Gale's federal claims, and decline to exercise supplemental jurisdiction over Gale's state-law claims.

## BACKGROUND

At 2:27 a.m. on September 4, 2016, a resident of 1409 Wyandotte Avenue in Royal Oak, Michigan called 911. (ECF No. 18-5). The caller stated, "It's not an emergency, but there is a strange man who knocked on my door." *Id.* The caller explained that her husband had answered the door, and that the man said "there's a police type thing around here" and that he wanted to help. *Id.* The caller and her husband provided a physical description of the man: white, 5'10", thin, about 25 years old, wearing jeans and a shirt. *Id.* The husband asked the police to check the area. *Id.*

The Royal Oak Police Department put a dispatch call out to its officers. (ECF No. 75-4, PageID 1729). The dispatcher relayed the information provided by the caller:

> Suspicious at 1409 Wyandotte, 1409 Wyandotte. Man knocked on the door, a white male, 5-10, thin, about 25 years old wearing jeans and a T-shirt. Told the homeowner he wanted to help him. Homeowner said he didn't need any help, closed the door. Last seen west on foot on Dondero.

*Id.*

Officers Phillip Klinge and Nathan Heppner responded to the dispatch call and proceeded to the caller's area. *Id.* Roughly ten minutes after the 911 call, Officer Klinge observed Plaintiff Joseph Gale walking down Wyandotte, near its intersection with East Hudson Avenue. (ECF No. 18-2).

Klinge determined that Gale matched the description, pulled to the side of the road, and turned on his car's lights. *Id.* Gale immediately stopped and put his hands in his pockets. *Id.* Klinge exited his car and asked, "You alright, man?" *Id.*[1] Gale shrugged, and appeared to say "yeah." *Id.*

As Klinge approached, he ordered Gale to take his hands out of his pockets. Gale immediately complied and put his hands up, roughly to the level of his shoulders. Klinge and Gale talked briefly before two more police officers, Officers Heppner and Michael Paramo, arrived on the scene. As the new officers walked up behind Gale, Klinge apparently asked Gale where he was going. Gale stated, "on 4th Street and - - 4th Street and - - I'm trying to think of where he lives. It's by Chicken - - It's by Chicken - - 4th Street and 11 Mile." 4th Street and 11 Mile do not intersect.

When Paramo reached Gale, he asked, "Do you have any ID on you? Do you mind if I - - do you mind if we check?" Gale responded, "Absolutely." The officers performed a brief patdown, reached into his back pocket, pulled out his wallet, and checked his ID.

One of the officers asked, "Were you knocking on any doors?" Gale responded, "I have not knocked on anyone's door." Paramo informed Gale that the officers were "just checking some things out" and that he "fit the description of someone knocking on doors." Gale insisted, "Man, it was not me." Paramo responded, "If everything pans out then you'll be on your way, okay?" and told Gale that he could put his hands down.

The officers continued to question Gale. He stated that he had attended Arts, Beats and Eats—a local festival—and that he was walking back to his friend's house, which was at "11 mile and 4th Street." The officers noted that those streets run parallel to each other. Paramo asked, "Do

---

[1]At this point, Klinge's microphone stopped working. The remaining facts are based on dash-cam footage and audio recordings from Heppner and Paramo. (ECF Nos. 18-3 and 18-4).

you know where you at?" Gale responded, "Frankly, I do not."

The officers asked Gale if he wanted them to call him a cab. He declined. One of the officers stated, "We can't have you walking around the street intoxicated." The officers again asked Gale if he wanted a taxi. He said, "that would be great." The officers asked if he knew the address of where he was going. Gale said that he could find it "if you were to take me to 3rd on the Rock."[2] Paramo stated "Here's the thing, dude. You're way off from where you said you need to be...we're trying to get you out of here, that way no one else calls on you again. We're not back down here wasting our time on you, okay?" Gale said, "I do not want to make you waste your time whatsoever." One of the officers asked, "Do you want us to get you to a - -" Gale stated, "If you can take me downtown, that would be great." Paramo stated, "I'll get you downtown."

Paramo and Gale walked toward Paramo's patrol car, which was parked on Hudson. As they approached, Paramo stated, "Before you hop in, I'm just gonna pat you down, man, just for my own safety." Gale asked, "Am I under arrest or something?" Paramo responded, "You're not under arrest, dude," and explained that, for safety reasons, he needed to search anyone he put his car. Gale stated, "I'm just asking." Paramo reiterated that Gale was "free to go walk on [his] own" and patted him down again. After the patdown, Gale got into the backseat of the patrol car. He could not open the doors from the inside.

Paramo got in the car, turned the corner onto Wyandotte, and pulled to the side of the road again. He and another officer had a brief conversation before he asked Gale for his friend's name. Paramo hoped that he could look up the friend's address and drop off Gale there instead of the Rock on Third. Gale, whose phone was dead, stated "if you got a iPhone charger up there, man, I'll plug

---

[2]Gale meant to reference the Rock on Third, a bar in downtown Royal Oak.

this shit in and I will tell you the exact address."  Paramo did not respond; apparently, he was listening to an incoming dispatch call about another suspect who matched the knocker's description.

Seemingly put off by Paramo's unresponsiveness, Gale stated, "All right.  Am I free to leave the vehicle?"  Paramo responded, "Yeah, you're good. I'm just trying to get your buddy's name so I can take you to your buddy instead of the Rock on Third."  Gale replied, "Yeah, I mean if you can just go to the Rock on Third, that would be great."

The exchange got heated as Paramo kept asking for the name of Gale's friend.  Exasperated by Gale's unwillingness to provide a name, Paramo stated:

> Listen to me. You're not under arrest. You're not in trouble. I'm doing you a favor. I'm trying to get you out of here, okay, so no one else calls on you. That's the thing. You've got a lot - - this is what's going on. We've had a ton of B&Es down here. Obviously it's not you. If I leave you down here to walk, someone's going to call on you again and we're going to come back out here again. I'm trying to avoid that for you.

Gale responded, "Well, I appreciate it."  After a few more of Paramo's attempts to get a name, Gale stated "I'll just walk there, okay?"

Paramo began driving.  Gale asked, "Am I free to leave?"  In response, Paramo called into dispatch saying, "I'll be taking [Gale] downtown to the Rock on Third and dropping him off."  He then asked Gale, "There, are you happy?"

Gale replied, "No, I'm just asking if I'm free to leave the vehicle."  Paramo yelled back, "What did I tell you the first time, dude? I said you're not under arrest. What don't you understand about that?"

Gale stated, "No, I'm requesting to get out of the vehicle."  At that time, Paramo had briefly paused at a stop sign before turning onto Lincoln Street, which had other traffic on it despite the early hour.  Paramo stated, "I'm getting you out of here."  After another request to leave the vehicle,

5

Paramo stated, "I'm getting you out of here, dude. I don't want anyone calling on you. You're not under arrest. I'm getting you out of Dodge."

Roughly 90 seconds after Gale's first request to leave the vehicle, Paramo dropped him off at a gas station in downtown Royal Oak. As he walked away, Gale stated, "I appreciate it."

On October 6, 2016, Gale filed a citizen complaint with the Royal Oak Police Department, alleging that Klinge, Heppner, and Paramo had acted improperly. Lieutenant David Van Ness investigated the complaint and met with Gale on October 17, 2016. This meeting was recorded. As the Court has previously noted, "[c]onsidered in context, Van Ness's statements [during the meeting] described innocuous, routine police work: responding to calls, investigating suspicious activity, managing intoxicated individuals, and identifying persons stopped by police." After his investigation, Van Ness determined that the officers had acted appropriately.

On January 2, 2017, Royal Oak Chief of Police Corrigan O'Donohue wrote a letter to Gale, informing him that his complaint was unfounded, and that the officers had acted in accordance with the Department's policies.

On July 5, 2017, Gale filed a "verified class action complaint"[3] against Klinge, Heppner, Paramo, and O'Donohue, in his official and individual capacities. Gale alleged eight counts: (1) search and seizure of his person in violation of 42 U.S.C. § 1983; (2) seizure of wallet/deprivation of property in violation of 42 U.S.C. § 1983; (3) abuse of process and conspiracy in violation of 42 U.S.C. § 1983; (4) *Monell* liability under 42 U.S.C. § 1983 against O'Donohue in his official capacity; (5) state-law false imprisonment/arrest; (6) state-law conspiracy to commit false

_____

[3]The Court notes that, despite the complaint's title, Gale never actually attempted to litigate this case as a class action.

6

imprisonment/arrest against Paramo and Heppner arising out of the detention in the patrol car; (7) state-law assault and battery; and (8) common law trespass. Gale later amended his complaint to add a ninth count: a violation of Michigan's Freedom of Information Act.

On July 10, 2017, Gale moved for a temporary restraining order, arguing that the Royal Oak Police Department had an unconstitutional policy that allowed baseless stops and frisks. The Court denied this motion. (ECF No. 7).

On August 2, 2017, Gale moved for a preliminary injunction. The Court denied this motion. (ECF No. 31). On appeal, the Sixth Circuit affirmed the Court's denial. (ECF No. 73).

During discovery, the officers and O'Donohue were questioned about the reason for the initial stop. Officer Klinge stated that Gale was stopped "in furtherance of [a citizen complaint] of suspicious activity." (ECF No. 75-7, PageID 1768). Officer Heppner testified that the officers stopped Gale to investigate a potential crime:

Q  What do you mean potential crime?

A  Well, the disorderly conduct, the knocking on the door, that is - - well, is one of - - is one thing that some criminals will do in neighborhoods when breaking into houses.

Q  So were you investigating the plaintiff's breaking into houses?

A  Well, that's all part of it. That was an area that had been hit with [break-and-enterings].

Q  Do you believe you had reasonable suspicion of a [breaking-and-entering] that night?

A  Well, knocking on the door, like I said, is one way they commit the [breaking-and-entering].

Heppner Dep. 64:18-65:8 (ECF No. 75-8, PageID 1787)[4].

Officer Paramo also testified about the rationale for the stop:

Q        Do you believe the answer you wrote [in response to one of Gale's interrogatories]

         is proper legal justification for conducting an investigatory stop?

A        Yes

Q        Why is that?

[Objection]

A        Because there was a 9-1-1 call into our Dispatch. Dispatch relayed it to two officers,

         officers were dispatched. They were given a description of the suspect or the person.

         They were told what transpired that made the person alarmed.

         On top of it we've had lots of  - - in that area at the time a lot of [breaking-and-

         enterings], a lot of disorderly calls around that time of morning people knocking on

         doors.

Paramo Dep. 37:25-38:14 (ECF No. 75-9, PageID 1802).

Chief O'Donohue also relayed his understanding of why the officers performed the stop:

A        This individual knocked on somebody's door at 2:30 in the morning

Q        And what does that fact in and of itself mean?

A        That the that disorderly conduct is disturbing the peace. I don't think a reasonable

---

[4]Notably, immediately after this exchange, Heppner opined on the legal question of whether the officers had reasonable suspicion of a breaking-and-entering.  He concluded that they did not.  Heppner's conclusion is irrelevant to the Court's analysis. *See Torres v. Count of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) ("The problem with [lay witness] testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards...This invade[s] the province of the court to determine the applicable law.")

person would expect to be woken up at 2:30 in the morning. I think that's unreasonable. I also think that that's a tactic that's used by home invasion suspects in an area where we had seen a number of home invasions.

O'Donohue Dep. 44:25-45:11. (ECF No. 75-10, PageID 1850).

On December 4, 2018, the parties moved for summary judgment. Generally, the Defendants argue that the officers had reasonable suspicion to stop Gale, that Gale consented to much of the activity that he now complains of, and that they are entitled to qualified immunity. Gale argues that he was unconstitutionally seized and searched, and that any consent was tainted by this wrongful seizure.

## ANALYSIS

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

## I.     Searches and Seizures

Gale argues that the officers violated his constitutional rights by (1) stopping him, (2) frisking him, (3) removing his wallet, (4) pressuring him to accept a ride  (5) frisking him again

before he got into Paramo's car, and (6) continuing to drive after he asked to leave Paramo's car. Gale also argues that the conduct of Klinge, Heppner, and Paramo is indicative of an unconstitutional stop-and-frisk policy promulgated or adopted by O'Donohue.

## A.    The Initial Stop

The parties agree that the officers initiated an investigatory stop. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). When evaluating a *Terry* stop, the Court considers "whether there was reasonable suspicion to initiate the stop." *United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012). Reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *Dorsey v. Barber*, 517 F.3d 389, 396 (6th Cir. 2008). To determine whether the officers had a reasonable suspicion, the Court must examine whether they were aware of specific and articulable facts that gave rise to a reasonable suspicion. *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008). That determination is made in light of the "totality of the circumstances." *Id*. Relevant considerations include anonymous 911 calls, *see Navarette v. California*, 572 U.S. 393, 397 (2014), the crime characteristics of the area where the stop occurred, *United States v. Smith*, 594 F.3d 530, 541 (6th Cir. 2010), and when the stop occurred. *Id*. Further, officers may evaluate relevant considerations in light of their training and experience. *See United States v. McCauley*, 548 F.3d 440, 445 (6th Cir. 2008).

Here, the officers contend that they stopped Gale to investigate whether he was in the process

of "casing" houses for burglaries.[5]   During their depositions, the officers testified that burglars sometimes knock on doors in the middle of the night to determine if anyone is home.   The officers also testified that the area where they stopped Gale had recently experienced a string of early-morning burglaries.   Thus, to justify the stop, the officers rely on the information provided during the 911 call (as interpreted in light of their training and experience), the crime characteristics of the neighborhood, and the time that the stop occurred.

### i. The 911 call

The Supreme Court has "firmly rejected the argument that reasonable cause for an investigative stop can only be based on the officer's personal observation, rather than on information supplied by another person." *Navarette*, 572 U.S. at 397 (internal citations omitted).   Although an anonymous tip, standing alone, "seldom demonstrates the informant's basis of knowledge or veracity," "under appropriate circumstances, an anonymous tip can demonstrate sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop." *Id.* (internal citations omitted).

In *Navarette*, a 911 caller reported that a vehicle had run her off the road.   A police officer located the vehicle and executed a stop to investigate whether the driver was drunk.   During the stop, the officers found thirty pounds of marijuana.   After the driver was indicted for drug trafficking, he moved to suppress the drugs, arguing that the anonymous 911 call did not provide reasonable suspicion to conduct an investigatory stop.

The Supreme Court compared two previous cases to illustrate when an anonymous tip

---

[5]The officers also stated that they suspected that the door knocking might have been a noise violation or disorderly conduct.

demonstrates sufficient indicia of reliability to support a reasonable suspicion:

> Our decisions in *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), and *Florida v. J. L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), are useful guides. In *White*, an anonymous tipster told the police that a woman would drive from a particular apartment building to a particular motel in a brown Plymouth station wagon with a broken right tail light. The tipster further asserted that the woman would be transporting cocaine. 496 U.S., at 327, 110 S.Ct. 2412. After confirming the innocent details, officers stopped the station wagon as it neared the motel and found cocaine in the vehicle. *Id.*, at 331, 110 S.Ct. 2412. We held that the officers' corroboration of certain details made the anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity. By accurately predicting future behavior, the tipster demonstrated "a special familiarity with respondent's affairs," which in turn implied that the tipster had "access to reliable information about that individual's illegal activities." *Id.*, at 332, 110 S.Ct. 2412. We also recognized that an informant who is proved to tell the truth about some things is more likely to tell the truth about other things, "including the claim that the object of the tip is engaged in criminal activity." *Id.*, at 331, 110 S.Ct. 2412 (citing *Illinois v. Gates*, 462 U.S. 213, 244, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

> In *J. L.*, by contrast, we determined that no reasonable suspicion arose from a bare-bones tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun. 529 U.S., at 268, 120 S.Ct. 1375. The tipster did not explain how he knew about the gun, nor did he suggest that he had any special familiarity with the young man's affairs. *Id.*, at 271, 120 S.Ct. 1375. As a result, police had no basis for believing "that the tipster ha[d] knowledge of concealed criminal activity." *Id.*, at 272, 120 S.Ct. 1375. Furthermore, the tip included no predictions of future behavior that could be corroborated to assess the tipster's credibility. *Id.*, at 271, 120 S.Ct. 1375. We accordingly concluded that the tip was insufficiently reliable to justify a stop and frisk.

*Id.* at 397-398. The Supreme Court then expounded on other indicia of reliability, including whether the tipster had personal knowledge of the alleged conduct, whether the tip was otherwise corroborated, the length of time between the alleged conduct and the tip, and the use of the 911 emergency system *Id.* at 398-401.

The Supreme Court noted that "even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that criminal activity may be afoot." *Id.* at 401. Applying the commonsense principle that "[r]easonable suspicion depends on the factual and practical

consideration of everyday life on which reasonable and prudent men, not legal technicians, act," the Court determined that "erratic" driving behaviors are sound indicia of drunk driving. *Id*. at 402. The Supreme Court concluded that the 911 caller's tip was sufficiently reliable to justify the stop.

Here, the anonymous caller and her husband reported a knock on their door. The couple had personal knowledge of the incident, which had occurred minutes before they called 911. They provided a physical description of the knocker. Although, in a perfect world, this physical description would have been more specific, Gale matched it and Gale's likeness to the description provides some corroboration for the caller's story. And, as testified to by the officers during their depositions, knocking on a door late at night is a tactic sometimes employed by burglars looking for an easy target. Thus, the 911 call (1) was based on personal knowledge, (2) was made close to the time of the alleged conduct, (3) had some corroboration, and (4) described conduct consistent with criminal activity. Considering these factors as a whole, the Court concludes that the 911 call had sufficient indicia of reliability for the officers to consider it when determining whether there was reasonable suspicion to stop Gale.

**b.    The Crime Characteristics of the Area**

The officers and O'Donohue testified that there had been a string of recent burglaries in the area where Gale was stopped. "To be sure, an individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *United States v. Bridges*, 626 Fed.App'x 620, 624 (6th Cir. 2015) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). But "officers are not required to ignore the relevant characteristics of a location in assessing reasonable suspicion." *Id*. "And the fact that the stop occur[s] in a high crime area [is] among the relevant contextual considerations in a *Terry*

analysis." *Id.*

Gale attempts to contradict the officers' sworn testimony about the area's characteristics by providing a Royal Oak Police bulletin that details the city's crime statistics between July 28, 2016 and August 4, 2016. As Gale notes, this bulletin does not describe any reported burglaries during that week. But it also does not cast doubt on the officer's testimony because it provides no insight on whether the relevant area of Royal Oak experienced any burglaries between August 5, 2016 and September 4, 2016 (the month-long period immediately before Gale's stop). Thus, the officer's statements regarding the recent burglaries remain uncontradicted, and the Court concludes that the officers properly considered the area's characteristics when determining whether reasonable suspicion existed to stop Gale.

### c.     The Time of the Stop

The officers testified that the time of the stop (roughly 2:30 a.m.) also contributed to their suspicion. The fact that suspicious activity occurred in "the very early hours of the morning" may support a *Terry* stop. *See Smith*, 594 F.3d at 539. Gale does not appear to dispute this point. Thus, the officers properly considered the time when determining whether an investigative stop was appropriate.

### d.     Conclusion for the Initial Stop

Considering the 911 call, the area's characteristics, the time, the officers' experience and training, and the other circumstances of the stop, the Court concludes that the totality of the circumstances supported the officers's reasonable suspicion that Gale might have been engaged in criminal activity, specifically breaking-and-entering or attempted breaking-and-entering. Thus, Gale's constitutional challenge to the initial stop is meritless.

**B.      The First Frisk**

Although the Court has determined that the *Terry* stop was justified, it must also determine whether the officers' frisk of Gale was justified. *See United States v. McMullin*, 739 F.3d 943, 946 (6th Cir. 2014) ("*Terry* clearly establishes that an officer's reasonable suspicion required to justify a stop of a suspect is different from that required to justify a frisk of a suspect..."). "To proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Id.* "[T]here are circumstances where an officer's reasonable suspicion will justify both stopping and frisking the suspect," such as when the suspected criminal activity would likely involve the use of a weapon. *Id.*; *see also Terry*, 392 U.S. at 28 (finding that an officer had a reasonable belief that the suspects "were contemplating a daylight robbery—which, it is reasonable to assume, would  be likely to involve the use of weapons.").

 As explained above, the officers had reasonable suspicion to believe that Gale might be involved in burglary—a crime that would likely involve a weapon. *See McMullin*, 739 F.3d at 946-947 (collecting out-of-circuit cases and concluding that reasonable suspicion of breaking-and-entering justified a stop and frisk).  Further, once stopped, Gale's reference to a nonexistent intersection fueled the officer's suspicion that he was up to no good. *See Smith,* 594 F.3d at 541 (concluding that "vague and evasive" answers "provided further support for the officers' reasonable suspicion that he was engaged in criminal activity.").  Thus, the officers were justified in performing the patdown because they reasonably suspected that Gale might be a threat to their safety.

**C.      The Wallet Removal**

**i.      Consent**

Gale alleges that Paramo unconstitutionally searched him and deprived him of his property

by removing his wallet from his pocket to check his ID. The officers argue that Gale consented to the wallet removal.[6] The standard for measuring consent under the Fourth Amendment "is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

During the frisk, Paramo asked, "Any ID on you? Do you mind if I - - do you mind if we check?" All parties agree that Gale responded, "Absolutely."[7]

Literally, the response "absolutely" to the question, "Do you mind if we check?" is a denial of consent: the person does, in fact, mind if you check. However, this literal interpretation is not necessarily consistent with the fundamental inquiry of the Fourth Amendment—objective reasonableness—and the commonsense approach that officers must take in these situations; Paramo was performing on-the-street police work, not reading a deposition transcript. Thus, the Court cannot rely only on a literal interpretation of the exchange and must instead determine whether a reasonable person in Paramo's position would have concluded that Gale was consenting to the removal of his wallet. *Id*.

The form of Paramo's question is not unusual. A nearly identical question was asked in *United States v. Tomlinson*, 190 F.Supp.3d 834 (S.D. Ind. 2016). There, an officer conducting an arrest asked the defendant, "Do you mind if I search your pockets?" The defendant responded,

_____

[6]This issue turns on whether Gale provided consent because the removal of a wallet during a *Terry* frisk is "not necessary to determine if the suspect [was] armed and [is] therefore unreasonable based on clearly established law." *King v. United States*, 917 F.3d 409 (6th Cir. February 25, 2019).

[7]The video is not clear as to whether Gale responded, "Absolutely," or "Absolutely not." However, because the parties agree that he responded, "Absolutely," the Court will assume that he did for the purposes of this Opinion.

"Yes." Construing this response as consent, the officer searched the defendant's pockets and found drugs. *Id.* at 837.

Before trial, the defendant filed a motion to suppress, arguing that he had not consented to the search of his person. Applying *United States v. Price*, 54 F.3d 342 (7th Cir. 1995), the district court concluded that the defendant's answer was "ambiguous because a reasonable person could have understood [him] to be communicating his consent or opposition to the search." *Id.* at 841. The court also concluded that, like in *Price*, "the crucial fact is [d]efendant's failure to protest upon learning that [the officer] understood his response as a consent to the search." *Id.* "If [d]efendant did not intend to consent, [the officer's] commencement of the search was 'the time to make that clear.'" *Id.* (quoting *Price*, 54 F.3d at 346 and also citing *United States v. Gonzalez-Ruiz*, 794 F.3d 832, 836 (7th Cir. 2015)).

The Court agrees with the analysis in *Tomlinson*. Given the circumstances of the stop (including Gale's tone, mannerisms, and general cooperativeness, as shown on the dash-cam footage), Gale's response was not as clear as its literal interpretation suggests; a reasonable person in Paramo's position would have understood Gale to be communicating his consent to the removal of his wallet. Further, Gale did not protest when Paramo removed his wallet to check his ID. If he truly did not intend to consent to the search, that was the time to make his refusal clear. Thus, the Court concludes that Gale consented to the removal of his wallet.

### ii.     Voluntariness of Consent

Gale raises one more challenge to the wallet removal. He argues that any consent that he provided was involuntary.

Consent to a search must be "voluntary, unequivocal, specific, intelligently given, and

uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir.2009).

The officer invoking consent bears the burden to establish that these criteria are met. *See Andrews v. Hickman County, Tenn.*, 700 F.3d 845, 854 (6th Cir. 2012). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The Sixth Circuit has described several factors that the Court should examine in the "consent calculus":

> First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights. *See United States v. Jones*, 846 F.2d 358, 360 (6th Cir.1988). While the police do not have to inform an individual of his right to refuse, the absence of such a warning is considered in the totality of the circumstances analysis. *See Bustamonte*, 412 U.S. at 227, 93 S.Ct. 2041. Second, a court should consider the details of the detention, including the length and nature of detention, *id.* at 226, 93 S.Ct. 2041; the use of coercive or punishing conduct by the police, *id.* at 226, 93 S.Ct. 2041; and indications of "more subtle forms of coercion that might flaw [an individual's] judgment," *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)

*United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011).

The consent calculus favors a finding of voluntariness. As an attorney, Gale was familiar with his constitutional rights and the requirements of consent. Although the officers did not inform Gale that he had a right to refuse consent, his legal training and experience surely did. Further, at this point, the detention had been brief and the officers had not acted in any way that could be described as "coercive or punishing." They merely conducted a quick, justified stop-and-frisk. Thus, based on the totality of the circumstances, the Court concludes that Gale's consent to the wallet removal was voluntary and uncontaminated by duress or coercion.

Because Gale provided voluntary consent, his claim that the removal of his wallet was unconstitutional is meritless.

### D.        The Second Frisk and the Ride with Paramo

Gale next argues that his ride with Paramo was an illegal seizure. In response, the Defendants argue that he consented to it. Gale also argues that, even if he consented to the ride, he revoked that consent at some point.

At the outset, the Court concludes that Gale consented to the ride and the frisk that Paramo performed before Gale got into the car. At the time that Paramo offered to give Gale a ride to downtown, Gale had been conversing with the officers for a few minutes and had a good understanding of why the officers had stopped him. In response to Paramo's offer, Gale responded, "I'd appreciate it, yeah." This statement was unequivocal and there is no objective indication that it was made under coercion or duress. Thus, Gale clearly consented to the ride.

After Paramo and Gale reached the car, Paramo told Gale that he had to pat him down before he could get in. Gale asked, "Am I under arrest or something?" Paramo responded "no" and explained that he needed to pat down anyone who enters his car, for safety reasons. Gale responded, "I'm just asking." Paramo then reiterated, "You're not under arrest. You're free to go on your own. I'm just doing you a favor." Paramo frisked Gale.

For reasons similar to those articulated above, the Court concludes that Gale consented to the frisk. Paramo explained why he needed to search Gale, and reiterated that Gale could walk off on his own. Gale declined to do so, and did not object to the search. Thus, this frisk was proper.

Once Gale was in the back of the police car, he was unable to leave without Paramo's assistance. This was not a problem, however, because Gale consented to receiving a ride to the

Rock on Third. As Paramo looked for the name of Gale's friend, Gale repeatedly asked if he was free to go. Paramo assured him that he was. Gale declined to provide his friend's name and, in apparent frustration, Paramo began driving to Gale's consented-to destination. As Paramo was driving, Gale—for the first time—expressly asked to get of the vehicle (i.e. he withdrew his consent to the ride.). Roughly 90 seconds after Gale's first request, Paramo let him out of the car, after he reached what appeared to be one of the first practical locations for a drop-off.

At this point, the consent issue presents a twist on the typical analysis because it involves consent to a seizure, not consent to a search. Consent to a seizure does not appear to be a well-developed area of the law. However, the Court finds the law surrounding consent to a search to be helpful—to a point.

It is well-settled that a party who consents to a search has a right to withdraw consent at any time. *See e.g., Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir.1999) ("[T]he consenting party may limit the scope of [the] search, and hence at any moment may retract his consent."). Once consent is withdrawn, the search "should be terminated instantly and the officers should promptly depart the premises assuming they possess no independent legal authority to remain." *United States v. Tatman*, 397 Fed.App'x 152, 163 (6th Cir. 2010) (cleaned up) (quoting *Painter*, 185 F.3d at 567).

While it is clear that an officer must stop a search "instantly" upon revocation of consent, it is not clear whether an officer must immediately stop his car after a person withdraws consent to a ride. While this proposition would make sense—after all, if consent is the sole justification for the deprivation of free movement, and the consent is withdrawn, the seizure must become improper—it ignores some practical realities. What if, like here, the road has other traffic on it? Can the officer continue driving to a safe location for the drop-off? Can he even pull over to the side

of the road or must he immediately slam on the brakes in the middle of the lane? In deciding what to do, can the officer consider the safety of the passenger and other drivers? If the officer cannot safely stop at the exact moment that consent is revoked, how long is appropriate to keep driving? Should that delay be measured in time or distance? The parties do not point to an applicable case or authority, and the Court has not uncovered any during its own research. Thus, the Court is left with the conclusion that Paramo's failure to immediately pull over *might* have resulted in an unconstitutional seizure. But, it is not clear whether it *actually did* violate a constitutional right.

This uncertainty works to Paramo's favor. Qualified immunity "shield[s]" public officials from [] liability if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity defense bars individual liability where "a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights." *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006). Qualified immunity "'gives ample room for mistaken judgments,' " protecting " 'all but the plainly incompetent or those who knowingly violate the law.' " *Chappell v. City of Cleveland*, 585 F.3d 905, 907 (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

"Once a defendant invokes qualified immunity, the plaintiff bears the burden of showing that (1) the defendant's acts violated a constitutional right and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct." *Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015). Both inquiries are "objective," as they turn on what the law is today and whether it was clearly established at the time of the challenged action. *Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727.

Here, Gale has failed to meet his burden. He has not identified a case or other authority that put Paramo on notice that his failure to immediately pull over, regardless of all other circumstances (e.g. traffic, safety, etc.), might have violated Gale's constitutional rights. Thus, the Court cannot conclude that the right at issue was clearly established.

After Gale's revocation of consent, Paramo continued driving to Gale's previously consented-to destination. He dropped off Gale roughly 90 seconds after his first request to leave the vehicle, at what appears to be one of the earliest safe drop-off locations. Based on these facts, and the lack of applicable case law, the Court concludes that a reasonable officer in Paramo's position would not have understood his actions to violate Gale's constitutional rights. Thus, he is entitled to qualified immunity for his conduct during the ride.

### E. Conclusion for Search and Seizure Claims

In sum, the Court concludes that (1) the officers had reasonable suspicion to stop Gale, (2) the officers had reasonable suspicion to frisk Gale, (3) Gale consented to the removal of his wallet, (4) Gale consented to the ride, (5) Gale consented to the second frisk before entering Paramo's car, and (6) Paramo did not violate a clearly established constitutional right by not immediately letting Gale out of the car. Thus, Defendants are entitled to summary judgment on Gale's search and seizure claims.

## II. Conspiracy to Violate Civil Rights

In Count III of his complaint, Gale alleges abuse of process and conspiracy in violation of 42 U.S.C. §1983. In his response to the Defendants' motion for summary judgment, Gale agrees to dismiss the abuse of process claim. (ECF No. 83, PageID 2395).

"A civil conspiracy claim under § 1983...lies where there is an agreement between two or

more persons to injure another by unlawful action." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014).

As explained above, the only possible constitutional violation that might have occurred was when Paramo failed to immediately stop the car after Gale revoked his consent. However, the record clearly shows that Paramo was the only officer to participate in the decision to continue driving. Thus, Gale cannot succeed on a conspiracy claim.

## III.    Municipal Liability

In Count IV of his complaint, Gale alleges *Monell* liability against O'Donohue in his official capacity. To establish *Monell* liability, the plaintiff must prove (1) the existence of a municipal policy or custom and (2) a direct causal link between the policy or custom and the alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Gale only argues that the Royal Oak police department has an unconstitutional policy (or lack thereof) or custom related to investigatory stops. (ECF No. 76, PageID 2059) ("And since the underlying stop was unconstitutional, Plaintiff has established an unconstitutional policy."); *id*. ("O'Donohue testified at his deposition that the City of Royal Oak does not even have any investigatory stop policy at all."); (ECF No. 76, PageID 2060) (describing the constitutional violation resulting from the challenged policy as an unconstitutional "investigatory stop and frisk."); (ECF No. 76, PageID 2061) (describing the department's alleged failure to train its officers in "(1) understanding the general meaning of 'reasonable suspicion'; and (2) understanding how to develop reasonable suspicion in response to a call/dispatch report."). In fact, Gale sums up his corresponding failure-to-train argument like this:

> Here, Plaintiff alleges that the City was deliberately indifferent to the rights of people who may come into contact with the City's police officers by failing to have adequate supervision policies, or any policies at all, in place with regard to investigatory stops and subsequent frisks. *In other words, Plaintiff is complaining that the City's deficient policies directly led to the officers conducting an investigatory stop of Plaintiff.*

(ECF No 76, PageID 2062) (emphasis added). Because the facts show that the officers were justified in stopping Gale and that the officers adequately understood reasonable suspicion, this claim must fail for lack of a constitutional deprivation. Moreover, Gale does not argue that the Department has an unconstitutional policy or custom of failing to immediately stop after a passenger revokes consent to a ride in a police car. Thus, the Court will grant summary judgement in favor of Defendants on this claim.

## IV.     **State Law Claims**

Because the Court has disposed of all federal claims, the Court declines to exercise supplemental jurisdiction over Gale's state-law claims of false imprisonment/arrest, conspiracy to commit false imprisonment/arrest, assault and battery, trespass, and violation of Michigan's Freedom of Information Act. *See* 28 U.S.C.A. 1367(c)(3).

## CONCLUSION

For these reasons, the Court **DENIES** Plaintiff's motion for summary judgment; **GRANTS** Defendants' motion for summary judgment as to Gale's federal claims; and **DISMISSES** Gale's state-law claims **WITHOUT PREJUDICE**.

The Court will enter a separate judgment consistent with this Opinion and Order.

**IT IS SO ORDERED.**

                                                      s/Sean F. Cox
Dated: April 29, 2019                                 Sean F. Cox
                                                      United States District Judge